### THE MARY P. RIEHL et al.

#### (District Court, D. Maryland. March 19, 1917.)

COLLISION ⬮71(1)—Tow Crossing Bows of Anchored Vessel Weighing Anchor—Mutual Faults.

    A tug with a car float in tow on a hawser crossed so close to the bows of a steamship on anchorage grounds, then engaged in weighing anchor, that the forward movement of the ship incident to that process brought the anchor, before it had been raised clear of the water, in contact with the float, driving one of the flukes through the side of the ship and causing a leak which damaged the cargo. *Held*, that the tug should have had in mind the possibility that the anchored ship might be getting under way, and was in fault for passing unnecessarily close; that the ship was also in fault for not observing the nearness of the tow, and suspending operations until it had passed.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101.]

In Admiralty. Suit for collision by Ezequiel Echevarria, master of the steamship Begona II, against the tug Mary P. Riehl and car float I. Decree for libelant against the tug for half damages.

R. E. Lee Marshall, of Baltimore, Md., for libelant.
George Forbes, of Baltimore, Md., for respondents.

ROSE, District Judge. The weather conditions in the harbor of Baltimore on the afternoon of the 16th of last August were those of a typical summer day. It was clear, there was scarcely any wind, and what there was came from the south. The witnesses differ as to whether it was a little to the east or a little to the west of the true meridian. At about 2 o'clock the tide was near the end of its ebb. On that morning the Spanish steamship Begona II had completed loading a cargo of 113,000 bushels of wheat and had been brought down by a tug to the anchorage grounds off the old Quarantine Station to await her pilot, master, and the last of her crew. These had come aboard, and about 2 o'clock she began to weigh anchor to start on her voyage across the Atlantic. After the anchor had broken ground, but before it had been raised clear of the water, there was a collision between it and the car float I, then in tow of the tug Mary P. Riehl. The steamship says that the blow drove one of the flukes of the anchor through her side. The damage to the ship itself was slight, but through the hole which it claims was thus made water came into the cargo and much loss followed. What would otherwise have been a trivial accident has thus become a matter of large pecuniary importance.

With the exception of the inevitable variations in the estimates of

distances and like matters, the only question of fact of real importance in controversy is whether the ship's engines had been started up before the collision took place. There are a number of persons who say they saw the water put in motion by her propeller before the float touched her anchor. The advocate for the tug and float says that the failure of the steamship to offer its engine room log raises the presumption that it contains entries which will be damaging to the ship. As the time of the collision is not fixed to the minute, and it is certain that the ship's engines could not have been in motion for more than a minute or two before the collision, and as there is no question that they were started up immediately after, it is highly improbable that any entries in the engine room log would throw any light upon the point at issue.

The testimony of such of the ship's company as were examined was taken three days after the accident. She sailed shortly thereafter. Under such circumstances it would be unsafe to attach any importance to the nonproduction of the engine room record. I saw and heard the witnesses who say that before the collision they saw the water moving from the ship's propeller, but I am persuaded that they have confused their recollection of what they did see after the float struck the steamship's anchor with what they supposed happened before. The pilot on the bridge of the steamship impressed me most favorably. He gave no order to start up the engines before the accident, and knew of none having been given. It was physically possible to start them without his knowledge, but it was unlikely that any such thing should have been done. Other facts in evidence sufficiently explain how the ships came together.

The tug with the car float in tow was bound from the Pennsylvania Railroad slip at Canton to Raisin's Wharf in Anne Arundel county. Its course carried it across the bow of the steamship. At the time the tug passed the steamship's anchor had not as yet broken ground, for the anchor chain was still across the bow of the vessel; the starboard anchor being off the port bow. The tug was moving at the rate of about 3 to 3½ miles per hour. The car float was about 240 feet long, and there was some 40 feet of hawser between the tug and the float. Not more than a minute could possibly have elapsed from the time the tug came abreast of the bow of the steamship and the collision. There was no perceptible change of course in either the tug or its tow. The latter was not being towed directly astern of the former, but somewhat to the starboard. If the ship had remained stationary, the float should have passed it with a clearance 20 feet greater than that of the tug. Allowing for the possibility of the effect of slight and unintentional variations of the tug's helm, or for sagging or swaying on the part of the more or less unwieldly float, the accident could not have happened, had not the steamship moved forward between the time at which the tug passed it and the float struck its anchor. That movement must have taken place.

What caused it is easy enough to understand. The steamship had been anchored with 15 or 16 fathoms of chain. The testimony seems to show that the anchor did not break out of the ground until the bow of the steamship had gotten almost, if not quite, up to it. The ship was anchored in about 35 feet of water. Allowing for the length

of the anchor itself, the ship must have moved 60 feet or more forward before the anchor came away. The momentum thus acquired would carry the ship forward, even after the anchor was free. Such a movement, however, could not have been rapid; no great distance could have been covered in the at most not more than a minute which elapsed between the passage of the tug and the collision. It could not in that time have covered anything like 200 feet, which the master of the tug says was between his course and the bow of the steamship. Indeed, even if the ship's engines had been then started, it is not probable that it could in that brief time have gathered sufficient headway to accomplish the feat. It follows that the tug must have passed much closer to the ship than its master now thinks it did. The accident happened because the tug passed so close to the bow of a vessel engaged in weighing its anchor that the forward movement of the ship incident to that process brought its anchor into contact with the float. The stem of the ship did not strike the float, because, although it was the ship's starboard anchor which was down, that anchor, just before it broke ground, was off the port bow. As the strain upon the anchor chain became greater, the ship's bow was necessarily thrown to port, and the blow of the float was a glancing one.

The ship was on anchorage grounds. Vessels crossing them must have in mind the possibility that an anchored ship may at any time get under way. They must not unnecessarily pass so close as to embarrass such process, or make it difficult or dangerous. The Aller, 73 Fed. 875, 20 C. C. A. 79; Britain Steamship Co. v. J. B. King Transportation Co., 131 Fed. 62, 65 C. C. A. 300.

It is true that the master of the tug claims not to have seen anything to indicate that the ship was moving; but it is a part of his own case that the ship had, by the time he crossed its bow, moved forward at least 60 feet. It was his business to have noticed that motion, if he did not. On the other hand, the ship was anchored in waters across which passage was frequent. It was bound to pay some attention to the movements of vessels in its vicinity. When from its deck it became evident, or with proper attention should have become evident, that the tug and its tow were moving on a course which would bring them across the ship's bow, and very close at that, the pull on the anchor chain should have been suspended, more chain paid out, and, if necessary, the ship's engines moved astern.

Both are to blame, and they must share the penalty.