**NORTHERN TRANSPORTATION CO. v. DAVIS, Director General of Railroads. P. DOUGHERTY CO. v. SAME. THE ELIZABETH MAERSK.**

(Circuit Court of Appeals, Second Circuit. June 5, 1922.)

Nos. 309, 310.

**1. Collision ⊜⇒95(4)—Steamer colliding with tow on Quarantine Anchorage held in fault.**

Steamer, which, without any lookout, while maneuvering, killing time, waiting for customs inspection, on coming out from behind high anchored vessel on Quarantine Anchorage collided with tow of tug, which, starting from such anchorage and making for the Narrows, was laying a course down a passageway 700 feet wide, between anchored vessels, the steamer and tug under navigation rules being on crossing courses, with the tug the privileged vessel, and the steamer recognizing her burden by blowing two whistles, answered by one, but then slowing, stopping, and backing, while the tug kept as far as possible to the starboard side of the passageway, *held* in fault.

**2. Collision ⊜⇒106—Tug held not in fault under rule of special circumstances.**

Tug, with tow of which steamer in fault collided on coming out from behind anchored vessel, the vessels under navigation rule being under crossing courses, with the tug the privileged vessel, *held* not also in fault under the rule of special circumstances; the general rule being that the steering and sailing rules apply, special circumstances being the exception, and the tug having been laying a course, and, if the steamer was not, it being her own fault, there being nothing to prevent her so doing.

**3. Collision ⊜⇒95(2)—Tug not in fault in not taking shortest course from anchorage to channel.**

Tug, with tow of which, on way from Quarantine Anchorage out to sea, a steamer collided, *held* not in fault in not taking shortest course to channel, her course through a lane between anchored vessels being, on account of crowded condition of anchorage and much shipping even in the channel, the better.

Appeal from the District Court of the United States for the Southern District of New York.

Two suits for collision, one by the Northern Transportation Company, and the other by P. Dougherty Co., each as owner of a barge injured, against the steamship Elizabeth Maersk, the colliding vessel, and James C. Davis, Director General of Railroads, in control of the Lehigh Valley Railroad, operating the tug Wyoming, which had the barges in tow. Decrees for libelants, and the Director General appeals. Modified.

Suits are for collision between a barge, in a tow of tug Wyoming, and Danish steamship Elizabeth Maersk. Collision occurred on the Quarantine Anchorage off Staten Island at 10:05 a. m. (ship's time), November 23, 1918. Wind, weather, and tide were not unusual; contact was between the bluff of Maersk's starboard bow, and one barge's port bow or side well forward; the blow injured that barge and threw it against the next one with sufficient force to do some damage. Maersk had just come in from sea; Wyoming, with three barges, had spent the night anchored off the southerly end of Stapleton, and was leaving for sea. She had the three barges "bunched" on a short hawser, intending to single them out in the lower bay.

At the time mentioned, the Narrows were closed by antisubmarine nets, except for a gap guarded by vessels of war on the Staten Island side. Maersk had passed through this gap, and Wyoming was making for it, by the shortest

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

route; i. e., by going south from the barges' anchorage. The facts more or less in dispute will be found in opinion. No fault was asserted against the barges. The trial court held both Maersk and Wyoming at fault, and the latter appealed.

James T. Kilbreth, of New York City, for appellant.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel); for the Elizabeth Maersk.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge. (after stating the facts as above). Maersk's pleading ascribes collision to conditions not supported by evidence, and on the evidence produced on her own behalf the steamer is condemned. By pleading, the Maersk put Wyoming, when first seen, "abaft her beam" and "off her starboard quarter"; thus apparently invoking the overtaking rule. The proof wholly fails to justify either the assertion or inference.

[1] We find that Maersk, heavily laden, arrived at Quarantine about 8 a. m., intending to anchor on Red Hook flats. After passing through the gap in the Narrows net, the steamer had still to be inspected by the customs; and to keep out of the way of a somewhat disabled ship, which was coming through the gap, the local pilot in charge of Maersk starboarded his helm and slowly went ahead. He only turned to port because, as he testified, it is "customary to turn a ship toward the wind." The Maersk seems to us to have been "killing time," while waiting for the customs cutter to appear.

To the northward of Maersk and southward of Wyoming's anchorage lay the steamship Mitre, anchored, light, and very high out of the water, heading toward Staten Island, and lying (as her pilot says) "east and west." Maersk's starboard helm brought her along Mitre's southerly side, close to the latter vessel, which obscured Maersk's hull from observers to the northward. Near the Staten Island shore was another anchored vessel, and between that vessel and Mitre there was a passageway or channel about 700 feet wide, down which Wyoming, with her barges straight behind her, laid a course.

No one on the tug could see Maersk's hull until either the latter passed out beyond Mitre, or Wyoming got far enough to the south to see along Mitre's southerly side; but Maersk's masts were seen moving over Mitre's hull. The Maersk had no lookout forward, and the first to see Wyoming were the men on steamer's bridge. The testimony from the steamer's bridge is that when Wyoming was first seen she was "about 500 or 600 feet" distant. She would have been seen sooner, had there been a lookout stationed forward, and materially sooner, because the Maersk was proceeding very slowly. It is plain that, if the navigation rules applied to this situation, the vessels were on crossing courses and Wyoming was the privileged vessel.

In this situation Maersk blew two whistles and Wyoming one. There is uncertainty as to how well the whistles were heard, but that is immaterial. The situation was plain, and the fact that Maersk did blow two whistles is evidence that the pilot recognized the burden upon his ship. The engine log of the Maersk shows:

"9:50 a. m. Slow ahead. 9:52. Half speed. 9:55. Stop. 9:58. Slow, and then half speed. 10:04. Full speed astern, and once more full speed astern."

Collision happened at 10:05, and the engine log does not pretend to record fractions of a minute. Wyoming, having blown one whistle, kept to the starboard side of the opening between the Mitre and the other anchored vessel, and passed as close to the latter as safety permitted; while Maersk, continuing under her starboard helm, changed her course sufficiently to produce a blow by the bluff of her own bow, instead of a collision at nearly right angles.

These facts put Maersk in fault under any view of the case. The only question is whether Wyoming committed any error. There are but two faults that can be suggested: (1) That the case is one of special circumstances; (2) it was a fault not to take the shortest path out of anchorage ground.

[2] As to the first point, the general rule is that the steering and sailing regulations apply; special circumstances are the exception. In this case the Wyoming was laying a course, and, if the Maersk was not, it was her own fault, for there was nothing to prevent her so doing.

[3] As to the second point, it is undoubted that all vessels must navigate with extreme care on anchorage ground. The Aller, 73 Fed. 875, 20 C. C. A. 79; The Riehl (D. C.) 241 Fed. 285. This duty was as incumbent on the Maersk as on the Wyoming; but it is not unlawful per se to go upon anchorage ground without the intent of anchoring, or to navigate across such ground. In the present instance Wyoming was obliged to choose (since she started on anchorage ground) between going eastwardly into the Main Ship Channel and going southerly a somewhat longer distance into the same channel. Her evidence is clear that, owing to the crowded condition of the anchorage and much shipping even in the channel, the best course was to go south through the lane to the westward of Mitre above described. It was navigation through very crowded waters at best. We think her choice was well made and her navigation careful.

The decrees below are modified, so as to place entire liability upon the Maersk. One bill of costs in this court to the Wyoming.