## THE ARFELD.

## THE LACUNA.

Nos. 17193, 17194, 17220.

District Court, E. D. Louisiana.
Sept. 2, 1930.

Dufour, Rosen & Kammer, of New Orleans, La. (Alfred C. Kammer and Edwin C. Hollins, both of New Orleans, La., of counsel), for Carl Willwater.

Dart & Dart, of New Orleans, La., and Bigham, Englar, Jones & Houston, of New York City (Henry P. Dart, Jr., of New Orleans, La., and Henry N. Longley and James W. Ryan, both of New York City, of counsel), for Great Western Sugar Co., Gunnison Valley Sugar Co., and others.

Denegre, Leovy & Chaffe, of New Orleans, La. (Henry H. Chaffe, of New Orleans, La., of counsel), for respondent.

BORAH, District Judge.

These actions arise out of a collision between the steamships Arfeld and Lacuna, the collision having occurred on the west side of the Mississippi river opposite Pilot Town, on February 2, 1923, at about 7:50 p. m. A libel for damages was filed by the owners of each of the vessels against the other vessel. The Great Western Sugar Company and the Gunnison Valley Sugar Company, et al., likewise filed separate libels against the Lacuna. In each libel the ship proceeded against is alleged to have been solely at fault. The owner of the Arfeld also filed, in proceeding No. 17193, a petition for limitation of liability. The above causes and all proceedings therein were consolidated for trial, and, as they arise out of the same circumstances, one opinion will be sufficient.

On the evening in question, the Lacuna, in charge of a licensed river pilot, was proceeding down the Mississippi river bound for London, England, with a cargo of fuel oil. Her voyage down the river was without incident until she arrived at a point in the river below Cubit's gap. There her engines were stopped and a one-blast signal was blown for the bar pilot. Ordinarily this signal would have been given before reaching Cubit's gap, but the pilot did not do so on this occasion because a southwest wind was blowing and he felt that his signal would probably not be heard. From 7:41 to 7:46 p. m. the engines of the Lacuna remained idle; consequently she was merely being carried forward by a 2½-mile current, aided by the forward motion she had acquired prior to the time her engines were stopped. She thus drifted down the river parallel to the course of the ascending Arfeld until abreast of Pilot Station at a distance of about 1,000 feet, when some one came out in a small boat and sang out "Go to anchor." This message precipitated a conversation between the pilot and captain of the Lacuna which culminated in a decision by the pilot, after his vessel had drifted to a point between Pilot Town and the first wing dam, to turn in the river and come to anchor on the west side of the river opposite Pilot Station. The river at this point is approximately three-quarters of a mile in width. Of this water space approximately one-half mile was really navigable to the Lacuna, which was drawing 29 feet, 5 inches aft and about 28 feet forward. The Lacuna likewise had a clear space on the east side of the river, down stream, within which to maneuver for, according to the pilot, she could turn in about 900 feet, and, as shown by the blueprints offered in evidence, the distance from Pilot Town to the submerged deflecting dike is 8,200 feet.

It is apparent, in the light of his subsequent actions, that up to this time the pilot of the Lacuna had paid little attention to the ascending Arfeld which had come out of the south pass into the river and was then proceeding at half speed on a slightly starboard helm towards the west bank of the river for the purpose of coming to anchor in accordance with the then existing quarantine regulations, this in spite of the fact that the night was clear and the visibility good and he had first seen the Arfeld's range lights down in south pass at a time when the Lacuna was above quarantine station. When the pilot of the Lacuna decided to round to and come to anchor, he blew one whistle to the Arfeld, which apparently was not heard by those in charge of her navigation, and then, without waiting for any reply signal or assent, put the engines slow speed ahead and the helm hard aport; this order to the engine room being given, according to the log of the Lacuna, at 7:46 p. m., or less than five min-

utes before the collision. In making this maneuver, the pilot used the light on the wing dam to turn his ship, and this no doubt distracted his attention and accounts for his having failed to accurately observe that the ascending Arfeld was not more than five or six ship lengths away and was then and had been continuously showing only her green light to the Lacuna. The green light of the Lacuna had likewise been continuously showing to the Arfeld, for she at all times maintained steerageway while descending the river. Shortly thereafter, for a ship will usually go forward several lengths before her rudder begins to take effect in turning, the red light as well as the green light of the Lacuna suddenly came into the view of those on board the Arfeld, and just as suddenly the green light disappeared. This was the first notice or information that the Arfeld had that the Lacuna was turning. When the Lacuna had turned partly around, her lookout signaled the presence of a steamer on the port bow, and the pilot, observing that the Arfeld continued to hold her course, blew a second signal of one blast, which meant and was understood by the Arfeld to mean that the Lacuna desired a port to port passing. The licensed pilot in charge of the navigation of the Arfeld at once realized that a compliance with this signal was impossible because the Lacuna was then two or two and a half points on the Arfeld's starboard bow and only 900 or 1,000 feet away, so he immediately blew the danger signal, followed by two blasts, signifying that he could not comply with the port to port passing, but that he intended to attempt a starboard passing. At the same time the engines of the Arfeld were put full speed ahead and her helm hard to starboard in an effort to bring the two vessels parallel with each other and thereby avoid a collision. When this second one-blast signal was given by the Lacuna, her pilot ordered half speed ahead, which the log shows was done at 7:49 p. m. With both vessels thus swinging more or less broadside under hard-over helms, they came into collision a fraction of a minute after 7:50 p. m. The port side of the stem of the Lacuna came into contact with the starboard side of the Arfeld at a point between the second and third hatches. The port anchor of the Lacuna became imbedded in the superstructure of the Arfeld at a short distance aft of the point of contact, and 105 fathoms of her port anchor chain was dragged out of the chain locker. Both vessels then went aground on the west bank of the river at a point just be-

low Pilot Town, where they remained until removed with the assistance of tugs.

These, in my judgment, are the facts upon which the legal conclusions in this case must rest.

Coming now to the duties and faults of the two ships, I think that it does not matter whether it was originally a passing or a crossing case. In either event, I believe that the Lacuna was grossly and solely at fault in changing her course to one directly across the course of the Arfeld at a time when the two vessels were too close to make such a maneuver safe. The vessels were not meeting end on so as to involve risk of collision, but were traveling on a parallel course, each showing her green light to the other, and, as long as they kept their courses, a collision was impossible. While thus traveling on parallel courses and when within four minutes and a fraction of each other, the Lacuna blew a one-blast whistle, and very shortly after that it became evident that the Arfeld could not comply with any one-blast signal because she was continuing to show her green light; at that time the engines of the Lacuna should have been stopped and put full speed astern. If these precautions had been taken, the collision would doubtlessly have been avoided. Instead, however, of taking any precautionary measures to avoid the collision, the pilot in charge of the Lacuna stubbornly held his course and gave another one-blast signal, to which the Arfeld blew a danger signal, followed by two blasts, which was a dissent to the course demanded.

It is true that the Arfeld did not give the first passing signal and did not answer the first signal of the Lacuna or stop and reverse, and it is argued that this failure of duty on her part was one of the contributing causes to the collision. While it was undoubtedly the duty of the Arfeld, as the ascending vessel, to give the first signal, still her failure to do so was not the proximate cause of the collision and did not give to the Lacuna, as the descending steamer, the right to initiate passing signals, but, on the contrary, it clearly was the duty of the Lacuna, according to pilot rule 1, to stop and back if necessary until signals for passing could be given and understood. This was the interpretation given to pilot rule 1 in the case of the *Managua Navigation Co. v. Aktieselskabet Borgestad* (C. C. A.) 7 F.(2d) 990. In the above case the Managua was the descending vessel, as the Lacuna in the case at bar, and it was the Managua that gave the first signal and crossed the bow of the Borgestad.

The court held that the Borgestad was not at fault by virtue of its failure to stop and reverse and because it did not appear that, if she had done so, the collision would have been avoided.

But it is argued on behalf of the Lacuna that, when she changed her course, the two steamers were approaching each other at right angles or obliquely so as to involve risk of collision, and that under rule 9, the Lacuna having the Arfeld on her port bow was required to hold her course and speed and that the Arfeld should have directed her course to starboard so as to pass under her stern. This argument is based on the false assumption that the vessels were approximately a mile apart when the second one-blast signal was blown. This is not the story of the Arfeld, though unquestionably it is the evidence of the Lacuna, although her pilot and third officer did testify variously on the subject while under cross-examination. But it is not necessary to determine this important fact from the mass of conflicting testimony. One has but to consider what the two ships did—the res gestæ of the occurrence. When this is done, the conclusion is inescapable that the vessels by this time had approached too close together to allow the Arfeld to pass under the stern of the Lacuna. Had she attempted to do so, she no doubt would have been cut in twain and suffered great property loss and possibly loss of life. Her only salvation was to pursue the course she actually followed. This is the judgment of Hinds, the passenger pilot on the Arfeld, who is the only disinterested witness in this case, and it is supported by the physical facts.

Furthermore, it is well settled that a vessel which is maneuvering to enter an anchorage ground or is maneuvering out from an anchorage ground is not on a definite course or a fixed speed, and she is therefore not a privileged vessel. The very foundation of the crossing case rule is that the burdened vessel, by observing the continuous course and fixed speed of the privileged vessel, knows absolutely where she will be and how she will be heading at any future moment. Old Time Molasses Co. et al. v. United States et al. (C. C. A.) 31 F.(2d) 963; The Hallgrim (The Havre Maru) (C. C. A.) 20 F.(2d) 720; The Socony No. 19 (C. C. A.) 24 F.(2d) 653; The Dorset (C. C. A.) 260 F. 32. The Lacuna did not have a fixed course or a fixed speed, but, on the contrary, had a continuously changing course and made two radical changes of speed. It was a clear situation of starboard to starboard passing, which the Lacuna tried without the assent of the Arfeld to change into a crossing case. The result of the Lacuna's action was not to create a crossing case or to change the starboard to starboard passing, but, at the most, to create a special circumstance case, and the Arfeld is not bound by the special circumstance rule because she did not assent to the attempt made by the Lacuna to change the existing situation. Proctor for the Lacuna, by conceding at the oral argument that the Lacuna created a crossing situation, thereby conceded that the Lacuna created risk of collision which would never have existed if the vessels had maintained their respective courses. The one unredeemable course for her was to assume such navigation and then fail in it. That she unquestionably did.

Where, as here, the fault of one vessel is clearly established, the evidence of the other vessel's fault must also be clear and convincing in order to make out a case for apportionment of damage. This principal has been repeatedly announced by the Supreme Court. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 15 S. Ct. 477, 39 L. Ed. 620; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519.

I am of the opinion that the Arfeld was at a place in the river where custom and usage dictated that she had a right to be, that she was not bound to anticipate the conduct of the Lacuna, and that she took all proper precautions as soon as chargeable with notice of risk of collision. My conclusion is that the Lacuna was wholly to blame and that the Arfeld was free from fault.

A decree may accordingly be entered in proceeding No. 17193 in favor of the libelant and against the Lacuna for the full damages sustained from the collision, and dismissing the cross-libel filed by the Anglo Saxon Petroleum Company, owners of the Lacuna, and an interlocutory decree entered on this libel referring the cause to a commissioner to take testimony and report the amount of libelant's damages. Separate decrees may likewise be entered in proceeding No. 17194 and No. 17220 in favor of the libelants and against the Lacuna for the full damages sustained by them from the collision and an interlocutory decree entered on these two libels referring the cause to a commissioner to take testimony and report the amount of libelants' damages.