## THE ISAAC T. MANN.

## THE DETROITER.

## POCAHONTAS S. S. CO. v. THE DETROITER.

## NATIONAL MOTORSHIP CORPORATION v. THE ISAAC T. MANN.

District Court, S. D. New York.

Aug. 24, 1945.

Bingham, Dana & Gould, of Boston, Mass., and Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, Seymour P. Edgerton, of Boston, Mass., and J. F. Gerity, of New York City, for Pocahontas S.S. Co.

Courtland Palmer, Edward Behrens and Charles H. Lawson, all of New York City, for National Motorship Corporation

BONDY, District Judge.

The libels, which were consolidated for trial, involve a collision between the American steam collier Isaac T. Mann, owned by Pocahontas Steamship Company, and the motor vessel Detroiter, owned by the National Motorship Corporation. The collision occurred April 23, 1942 in the Bay

Ridge General Anchorage which was crowded at the time.

The master of the Mann, which was anchored in the anchorage over night, testified that the heaving of the anchor was started at about 5.45 a.m.; that it was aweigh at 5:56; that at 6, after heading the Mann northerly by the use of her left rudder, in a strong ebb tide flowing southwesterly at the rate of almost two knots, he ordered the engines put slow .speed ahead; that at 6:02 o'clock, after the Mann was under way and had traveled about 100 yards, the Detroiter was observed off the Mann's starboard bow entering the anchorage; that at about 6:03, two minutes before the collision, he blew a two blast signal to give notice to the Detroiter that the Mann intended to direct her course to port and that the Detroiter should not attempt to cross the Mann's bow; that when the Mann's signal was not immediately answered the Mann's engines were stopped; that at about 6:04, a minute after the Mann's two blast whistle, the Detroiter sounded three blasts indicating that her engines were going full speed astern; that about a minute thereafter, when the Mann had substantially lost her headway, the bow of the Detroiter struck the Mann about 50 feet abaft her stem on her starboard side. He testified that there was a vessel anchored 800 or 900 feet to the north of the Mann, another 400 to 500 feet west of that vessel and that about 800 feet astern of the latter, three tankers in a row, each about 400 feet behind the other and about 150 to 200 feet to the port of the Mann, and another vessel about 600 feet astern the Mann; that the anchorage was shallow on the starboard side, that he proceeded northerly with the intention of turning to port and leaving the anchorage for the main ship channel when he passed the three steamers anchored off his port, if he could safely do so, or after he passed between the two vessels anchored about 800 feet to the north. He further testified that he could not give a danger signal and stop or reverse after he started, because had he done so at the time he blew the two blasts, the strong ebb tide flowing in a southwesterly direction at about two knots per hour would have carried him against the vessels anchored off his port and that he could not turn to starboard on account of shoal water on that side, that he had to navigate with reference to these conditions, all of which should have been observed by the navigator on the Detroiter which was proceeding at a high rate of speed over the anchorage.

The master of the Detroiter testified that while proceeding southerly through the Bay Ridge Channel, easterly of the anchorage, at full speed of 7 knots through the water, upon observing an open space of about 1200 feet between the bow of the Mann and two vessels anchored northwardly of her, he turned into the anchorage, that at that time the Mann, about 2,000 feet away, was not moving and displayed a black anchor ball, indicating that she was at anchor; that considering his vessel to be the privileged vessel he kept his course and his speed and that immediately after the two blast signal given by the Mann, the collision being inevitable, he blew three blasts, reversed his engines and dropped his anchor. He admitted that the Detroiter proceeded over the anchorage at the rate of about seven knots through the water and about nine knots over the ground without having slackened the full speed at which he had been traveling through the Bay Ridge Channel and that though he observed the Mann 2,000 feet away when he entered the anchorage, he did not observe her again until she was within 400 to 450 feet of the Mann, when the lookout called out "She is moving" at which time he first knew she was moving and the collision could not be avoided. The chief mate of the Detroiter in his deposition stated that he observed the Mann four or five times between the time when the Detroiter came on the anchorage and the Mann blew two blasts and that it was not until the last time he looked that he was able to distinguish that the Mann was making way through the water, that he then saw she had a bone in her teeth foaming out from the bow with spray kicking up from the stern eight or ten feet into the air. He, however, further stated that at the time of the collision, about 30 seconds later, the Mann was stopped or practically dead in the water and that she did not move ahead more than two feet after the collision.

The court believes that the stories told by the witnesses for the libellant were the more accurate and reliable. It believes that at the time of the collision the Mann was navigating to leave the anchorage. She was bound south to Norfolk and, as the respondent claims, in a hurry to join a convoy in Ambrose Channel before its

·departure. In these circumstances, the only purpose the Mann had in proceeding northerly could have been to get off the anchorage ground into the main channel with safety.

■ If the navigation rules applied, the Mann and the Detroiter were on crossing courses and the Detroiter was the privileged vessel and bound to keep her course and speed. However, the court is of the opinion that the vessels were navigating under special circumstances then existing, and that the Detroiter was proceeding without exercising the diligence and care required of a vessel proceeding through a crowded anchorage.

■ Anchorage grounds may not be used with the same freedom as unrestricted waters, and vessels should not embarrass a vessel properly using the grounds for purposes of navigation in connection with anchoring. Such vessel has the prior right to the usage of the water over those not necessarily there. The Merrill C. Hart, D.C., 162 F. 371, 375, 376, affirmed 188 F. 49.

■ "Vessels crossing (anchorage grounds) must have in mind the possibility that an anchored ship may at any time get under way. They must not unnecessarily pass so close as to embarrass such process, or make it difficult or dangerous." The Mary P. Richl, D.C., 241 F. 285, 287. Navigation of a vessel to or from her anchorage is under special circumstances. See Northern Transportation Co. v. Davis, 2 Cir., 282 F. 209; The Arfeld, D.C., 42 F.2d 745; Compare The Socony No. 19, 2 Cir., 24 F.2d 653; Red Star Towing & Transportation Co. v. F. J. Bauer Towing Line, 1930 A.M.C. 1284.

■ The navigation having been under special circumstances the use of the two blast signal by the Mann to signify her intention to direct her course to port was not a fault on her part. Postal S.S. Co. v. El. Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335.

■ "* * * the Inland Rules do not provide any signal for steamers meeting on crossing courses, but under the Pilot Rules, a two blast signal from the burdened vessel (the steamer having the other on her starboard bow) signifies intention to direct her course to her own port." W. H. Boyteaux, The Rules of the Road at Sea, p. 180.

Witnesses for the Detroiter testified that the Mann displayed a black anchor ball at the time of the collision. The anchor lights which were displayed during the night, and the black anchor ball which is displayed during the daytime to indicate that the ship is at anchor are raised by the same halyard. It is not probable that when the anchor light was taken down the anchor ball was raised because the Mann was under way before sunrise. See Pilot Rule 312.23.

■ The failure of the Mann to have a lookout at her bow was not a proximate cause of the collision. The Detroiter was observed by the Mann from the time that the Detroiter turned on to the anchorage. It was observed by the master as soon as it would have been observed by a lookout.

■ That neither the master nor the lookout on the Detroiter observed that the Mann was under way until thirty seconds before the collision, and that the Detroiter crossed the anchorage grounds without reducing her speed and without proper care and vigilance to avoid interference with the navigation of the Mann, which was necessarily on the anchorage grounds, constituted faults on the part of the Detroiter, which in themselves were sufficient to account for the collision and there accordingly should be a decree for the libellant.