**LYKES BROS. STEAMSHIP COMPANY, Inc., and J. W. Banta, d/b/a Banta Towing Company, Appellants,**

**v.**

**UNION CARBIDE & CARBON CORPORATION, Appellee.**

No. 16793.

United States Court of Appeals Fifth Circuit.

March 12, 1958.

Rehearing Denied May 30, 1958.

Adams & Reese, New Orleans, La., for J. W. Banta.

George C. Ehmig, Alfred M. Farrell, Jr., New Orleans, La., Terriberry, Young, Rault & Carroll, New Orleans, La., of counsel, for Lykes Bros. S. S. Co.

Selim B. Lemle, Geo. B. Matthews, New Orleans, La., Lemle & Kelleher, New Orleans, La., for Union Carbide & Carbon Corp.

Before BORAH and JONES, Circuit Judges, and WRIGHT, District Judge.

J. SKELLY WRIGHT, District Judge.

On July 21, 1951 appellee's barge, CC–204, the second of a two-barge tow being pushed by the Tug Anita D,[1] was in collision with the SS Velma Lykes[2] in the Houston Ship Channel. The able and experienced trial court, whose Findings of Fact[3] are not clearly erroneous,[4] held both the Tug Anita D and the SS Velma Lykes to blame for the collision, and the owners of both vessels are here appealing.

From seaward a dredged channel enters Galveston Bay. After passing Galveston, this channel makes a vee, the left-hand fork being known as the Texas City Channel, and the right-hand fork the Houston Ship Channel. The course of the channel for approximately one mile before reaching the vee is 298°. The course of the Texas City Channel leaving the vee is 298°, and the course of the Houston Ship Channel leaving the vee is 318°.

At the time the vessels first came in sight of each other, the Anita D, having turned to port out of the Texas City Channel, was in the open bay on a course, approximately 050°, perpendicular to the Houston Ship Channel. She was intent on crossing the Houston Ship Channel and picking up the Intracoastal Waterway in the vicinity of Port Bolivar. The Velma Lykes at that time was on course 298° in the dredged channel before reaching the vee. The Anita D's engines were on full speed ahead making good four to five knots over the ground, while the Velma Lykes also was full speed ahead, making good 14 knots over the ground, with slightly flooding tide. When the Velma Lykes reached the vee in the channel, she changed her course to 318° to head for Houston via the Houston Ship Channel.

The witnesses from the Anita D testified that immediately they saw the Velma

---

1. The overall length of the tow and tug was approximately 450 feet.

2. The Velma Lykes was a seagoing steamer 435 feet in length.

3. 155 F.Supp. 691.

4. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Bisso v. Waterways Transportation Company, 5 Cir., 235 F.2d 741, 1956 A.M.C. 1760.

shape her course for the Houston Ship Channel, the Anita D's engines were ordered full speed astern. The Anita D testified further that, being at that time only 600 feet from the westerly edge of the Houston Ship Channel, which channel was an additional 500 feet wide, she was unable to stop her tow before the second barge thereof was struck amidship by the Velma Lykes at the extreme easterly side of the channel. She claims that the only signals she heard from the Velma Lykes, other than a long single blast when the Velma Lykes was adjusting her course to starboard to enter the Houston Ship Channel, were danger signals and that she returned them.

The witnesses from the Velma Lykes testified that after she was in the Houston Ship Channel approximately one quarter of a mile she sounded a one-blast signal to indicate that, as the favored vessel in a starboard hand crossing situation,[5] she would maintain her course and speed, that there was no answer to that signal so she repeated it, that there was still no answer, so she then sounded two or three danger signals. The Velma Lykes also testified that two and one-half minutes before the collision, when it became apparent that the Anita D was not going to give way as required by the rule, she reversed her engines [6] and sought the extreme starboard side of

the channel, that in a further attempt to arrest her forward progress, she let go both anchors but that in spite of all of her efforts, her bow came into collision with the second barge of the tow on the extreme starboard side of the channel at a point approximately 1.3 nautical miles north of the vee.

The trial court held the Anita D at fault for failure to comply with her obligation under the starboard hand rule to give way to a vessel on her own starboard hand in a crossing situation. The trial court did not credit the Anita D's testimony to the effect that she reversed her engines immediately on seeing the Velma Lykes shape her course up the Houston Ship Channnel. The trial court found the Velma Lykes at fault for pressing her privilege in a crossing situation into a collision. The trial court found that the Velma Lykes held her course and speed long after it should have been apparent to her that the Anita D was not going to give way.

■ While we agree with the result reached by the trial court, we arrive by a different route. The situation which presented itself to these two vessels at the time they came in sight of each other, and began to navigate with respect to each other, was not a crossing situation calling for the application of the star-

---

5. The starboard hand rule on which the Velma Lykes relies is really a series of rules now enacted into law. They are as follows:

Inland rules

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." 33 U.S.C.A. § 204.

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed." 33 U.S.C.A. § 206.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other." 33 U.S.C.A. § 207.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approach-

ing her, if necessary, slacken her speed or stop or reverse." 33 U.S.C.A. § 208.

Supplementary to the statutes the Coast Guard promulgated:

Pilot Rules for Inland Waters

Sec. 80.03(3). One short blast of the whistle signifies intention to direct course to own starboard, except when two steam vessels are approaching each other at right angles or obliquely, when it signifies intention of steam vessel which is to starboard of the other to hold course and speed. 33 C.F.R. 80.03.

6. The engine room bell book of the Velma Lykes shows that the order to reverse the engines was actually received one minute and a half before the collision. Consequently, the propeller of the Velma Lykes reversed very little, if at all, before the collision.

board hand rule. At that time the Velma Lykes was not on a course that could be definitely ascertained by the Anita D.[7] As a matter of fact, she was approaching a vee in the channel which gave her a choice. If she were to take the Texas City Fork, there would, of course, be no danger of collision because she would then pass well astern of the Anita D. But if she took the Houston fork, the danger of collision would immediately arise since the vessels would then be proceeding full speed ahead on collision courses a little more than a mile apart. Consequently, even though the starboard hand rule is not applicable and the Velma Lykes was not the favored vessel in a crossing situation, by application of the rule of special circumstance,[8] which in our judgment does apply here, the Anita D must be held at fault for she knew, admittedly, there was a possibility, if not a probability that the Velma Lykes would take the Houston fork of the channel and would thereby place herself on a collision course with the Anita D. Such knowledge immediately required the Anita D to nagivate with caution by reduction of speed or change in heading to prepare for that possibility. Instead, she continued full speed ahead with rudder amidship right across the channel and the path of the Velma Lykes.

The Velma Lykes is in at least as bad a position with reference to fault as is the Anita D. Unlike the Anita D, she knew that when she came to the vee she would adjust her course to run the Houston Ship Channel. She was bound to know, therefore, that she would then be on a collision course with the Anita D slightly more than a mile away. Ordinary prudence in those circumstances, as well as the rule of special circumstance, required that she reduce her speed to avoid the collision that was waiting for her unless she did. Adjusting her course to starboard and thereby setting up a crossing situation with the Anita D gave her no privilege whatever.[9] She was bound to know that the Anita D could not divine her eventual course before she reached the vee. She should have prepared for the possibility that the Anita D would assume that the Velma Lykes would continue on her same heading up the Texas City Channel rather than adjust her heading to starboard to run the Houston Ship Channel. The Velma Lykes should also have realized that, after she entered the Houston Ship Channel, there would be neither time nor space for the vessels to navigate with safety under the starboard hand rule.[10] The situation was one which called for caution, not speed, on the part of both vessels. It was a situation squarely covered by the rule of special circumstance.

As a matter of fact, the present treatment of the situation by the Velma Lykes

7. Griffon, Collision, at p. 106, states:
"In order to have a situation to which the crossing rules apply, it is, in general, necessary (1) that the holding-on vessel, at least, be on a *definite course*, as the phrase is defined below (sec. 43); (2) that the anticipated courses of the vessels involve *risk of collision*, by reason of intersection or otherwise (sec. 44); (3) that the vessels encounter one another with *time and space sufficient* reasonably to permit of the manoeuvres required by the crossing rules (sec. 45)."

Judge Borah, in The Arfeld, D.C., 42 F.2d 745, at page 748, makes perhaps the clearest statement of the basic requirement of the rule:
" * * * The very foundation of the crossing case rule is that the burdened vessel, by observing the continuous course and fixed speed of the privileged vessel. knows absolutely where she will be and how she will be heading at any future movement. * * * "

See also The Hoboken, 2 Cir., 59 F.2d 993; The Hallgrim, 2 Cir., 20 F.2d 720; Commonwealth & Dominion Line v. United States, 2 Cir., 20 F.2d 729; The Pierrepont, 2 Cir., 248 F. 682.

8. Rule 27 of the Inland Rules reads as follows:
"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." 33 U.S.C.A. § 212.

9. The Albert Dumois, 177 U.S. 240, 20 S. Ct. 595, 44 L.Ed. 751; The Arfeld, supra. Compare The Steel Inventor, 2 Cir., 43 F.2d 958, 1930 A.M.C. 1468.

10. See Griffon, Collision § 45 at page 117.

as a crossing situation seems to be an afterthought. Apparently her navigators at the time did not so consider it. Neither her deck log nor her deck bell book made reference to a crossing situation until they were tampered with, long after the collision, by interlineation of the word "crossing" into otherwise nondescript entries. Moreover, there is no reference in her log or her deck bell book to the making of single whistle signals as required of a favored vessel in a starboard hand situation.[11] The only reference in the log and the deck bell book to signals in connection with this collision are identical entries reading "repeated danger signal to tow ahead, no answer," which entries were subsequently changed by interlineation of the word "crossing" between the words "tow" and "ahead" to make them conform to the vessel's present position in this litigation.

The fact that the Velma Lykes has tampered with her log casts a cloud of suspicion over her entire case.[12] This cloud is darkened by the testimony of the master regarding the sounding of two single whistle signals, the second after the first was unanswered, to advise the tug that in the crossing situation which presented itself, the Velma would hold her course and speed. In his letter report to the Coast Guard written on the day of the collision, the master makes no reference whatever to a starboard hand situation or to the sounding of single whistle signals. He writes only of sounding danger signals. Two days after the collision the master was ap-

parently still unaware of a starboard hand situation or of sounding single whistle signals because in a sworn statement to the Coast Guard, he mentioned neither. How the master was able to remember these things over three years after the collision, at the time his deposition was taken for the trial of this case, is not disclosed. Certainly his recollection was not refreshed by the copy of the deck bell book of the Velma Lykes, produced during the taking of his deposition,[13] because again the reference there was only to the sounding of danger signals, with no reference whatever to single whistle signals or crossing situation. In short, the master's testimony in this regard appears to be the result of inspiration subsequent to the collision rather than observation at the time thereof.

In view of the unusual and uncertain situation confronting the Anita D and the Velma Lykes when those vessels first began to navigate with respect to each other, the rule of special circumstance required both vessels to reduce speed and proceed with caution. Instead of complying with their obligation under the rule, both vessels pressed doggedly on, full speed ahead, into the jaws of collision. The truth of the matter is, and the cause of this collision was, that neither vessel was navigating with respect to any rule. The Anita was intent only upon beating the Velma Lykes across the channel and the Velma Lykes was intent on blowing her out of the way.

Affirmed.

11. See Note 5.

12. See Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 102 F.2d 450, 453; The Silver Palm, 9 Cir., 94 F. 2d 754, 762, 1937 A.M.C. 1427; Capehorn Steamship Corporation v. Texas Company, D.C., 152 F.Supp. 33.

13. Strangely enough, this "reproduced copy or abstract of the deck bell book" covering the entry in question was ap-

parently an authentic copy of the original entry before the word "crossing" was interlined. The original deck bell book as well as the original deck log, used in examination of Third Officer Throgmorton of the Velma Lykes, showed the interlineation of the word "crossing" between the words "tow" and "ahead." Throgmorton testified that he interlined the deck bell book and that the master conformed the log to the bell book.