## OLD TIME MOLASSES CO. et al. v. UNITED STATES. et al.

## OLD TIME MOLASSES CO. v. NEW ORLEANS COAL & BISSO TOWBOAT CO.

Circuit Court of Appeals, Fifth Circuit.
April 8, 1929.

Rehearing Denied May 15, 1929.

Nos. 5418, 5419.

James W. Ryan, of New York City, and Eugie V. Parham, of New Orleans, La. (Bigham, Englar & Jones, of New York City, on the brief), for appellants.

Edouard F. Henriques, Sp. Asst. in Admiralty to the U. S. Atty., and W. I. Connelly, Atty. U. S. Shipping Board, both of New Orleans, La., for the United States.

Philip S. Gidiere, of New Orleans, La. (Spencer, Gidiere, Phelps & Dunbar, of New Orleans, La., on the brief), for appellee New Orleans Coal & Bisso Towboat Co.

Before BRYAN and FOSTER, Circuit Judges, and GRUBB, District Judge.

FOSTER, Circuit Judge. These two cases involve practically the same issues, and may be disposed of in one opinion.

On February 14, 1923, at about 5:45 o'clock a. m., a collision occurred in the Mississippi river, in the harbor of New Orleans, between the concrete ship San Pasqual, owned by the Old Time Molasses Company, and the steamship Colorado Springs, owned by the United States. At the time of the collision, the San Pasqual was in tow of the steam tug Barranca, owned by the New Orleans Coal & Bisso Towboat Company.

A libel was filed on behalf of the United States against both the San Pasqual and the Barranca, charging both with negligence causing the collision. The Old Time Molasses Company answered, denying fault on the part of the San Pasqual, alleging that both the Barranca and the Colorado Springs contributed to the collision, and also filed a separate libel against the Barranca, setting up a contract between the owners of the Barranca and itself to tow the San Pasqual from New Orleans to Santiago, Cuba, where it was intended to use the vessel as a barge for the storage of molasses, under which contract it was alleged the tug was in complete charge of the ship for the entire voyage. It is unnecessary to more specifically describe the pleadings.

The record supports the following conclusions as to the material facts: The Barranca was an ocean-going tug, of about 142 feet long by 27 feet beam with engines of 1,250 horse power. She had frequently towed vessels as large as the San Pasqual, and did successfully tow her to Cuba after the collision. She was made fast to the port quarter of the San Pasqual, with her stern extending somewhat aft of that of the said vessel, which was customary and proper for towing in the Mississippi river. The San Pasqual was in charge of a licensed river pilot employed by her owners, and had on board a captain licensed as master of steam and sailing vessels, a chief mate, also licensed, and a crew of seven men. She had no motive power, as her engines had been dismantled, but had sufficient equipment to operate her steam-steering gear, which was in good working order. She was anchored at the usual anchorage ground in the harbor of New Orleans, approximately 600 feet from the west bank of the river. She was about 409 feet long by 54 feet beam, and, being light, was riding high, about 20 feet above the water. After weighing anchor, the San Pasqual first proceeded up stream a short distance, and then turned to the right, using her own steering gear, for the purpose of heading down the river and so out to sea. The river at this point is about 2,500 feet in width. There was not enough room, apparently, to complete the turning movement by going ahead on the engines of the tug, and the order was given by the pilot in charge of the San Pasqual for full speed astern. The tug promptly obeyed the order. The San

Pasqual was then in a position heading almost directly across the river towards the east bank. She was seen by those on the Colorado Springs, a steamship of about equal size, then coming up the river, running about 300 feet from the east bank, and at that time about ¾ of a mile away. The Colorado Springs was also in charge of an experienced, licensed river pilot. He observed the green light of the San Pasqual about two points off his port bow, and gave a signal of one blast of his whistle, indicating his intention to pass to starboard. This was heard by the pilot of the San Pasqual, and he answered with one blast of the whistle from the tug. The signals were thoroughly understood by both pilots, and it was the intention of each to pass to the right. However, the San Pasqual could not complete her turning movement, and the Colorado Springs continued her course and speed, which was about 8 miles an hour, until it became apparent that the collision was imminent. The pilot of the Colorado Springs then ordered her helm put hard astarboard to swing her stern out to avoid the bow of the San Pasqual, but this manœuvre was not successful, and the collision occurred, the stem of the San Pasqual striking the Colorado Springs on her port side, in the vicinity of her hatch No. 4, about abreast of her main mast. Both vessels were damaged, and immediately dropped their anchors.

The District Court reached the conclusion that the San Pasqual was solely at fault, and exonerated both the Colorado Springs and the Barranca. Relying on the case of In re Walsh (C. C. A.) 136 F. 557, and other authorities cited in the opinion, the District Court also reached the conclusion that the Barranca was employed merely to furnish motive power to the San Pasqual, and therefore was not responsible for any faults of that vessel contributing to the collision.

█ We agree with the District Court that the San Pasqual was at fault. Her pilot knew, or should have known, that she would be some minutes in making the turn, and a sharp lookout should have been kept for approaching vessels. This her pilot admits he did not do. The engines of the tug had been going astern two or three minutes without any appreciable effect on the vessel when the Colorado Springs gave the passing signal, which first called the attention of the pilot of the San Pasqual to her approach. He should not have answered and agreed to the signal. On the contrary, he should have blown the danger signal of four or more short blasts

to indicate that he was helpless. It was negligence under the circumstances to agree to the passing signal, and this evidently misled the Colorado Springs, and induced her to continue her speed and course.

█ However, we also have reached the conclusion that the Colorado Springs was equally at fault. It was the duty of both vessels to avoid the collision, if possible. A vessel entering a crowded harbor, such as New Orleans, is bound to exercise more than ordinary care. Culbertson v. Steamer Southern Belle, 18 How. 584, 15 L. Ed. 493. The purpose of requiring vessels navigating the Mississippi river from New Orleans to the Gulf to employ licensed pilots is to have them in charge of experienced men familiar with local conditions, in order to avoid, so far as possible, accidents to themselves and other vessels. The pilot of the Colorado Springs knew, or should have known, from his experience that in entering the harbor he was apt to encounter vessels leaving the anchorage grounds or docks. From the time he first sighted the San Pasqual until the collision she exhibited only her green side light. This indicated clearly that she was heading directly across the river towards the east bank, and could not proceed far enough in that direction to clear a ship ascending on that bank. It also indicated that she was not then in a position to pass to the right.

The pilot of the Colorado Springs knew that before the San Pasqual could comply with the passing signals she would have to show her red side light. If he did not see it promptly, that fact alone was sufficient to warn him. The situation presented neither a crossing nor a passing case, and the rules applicable thereto were not safe guides to avoid the collision. Rather should the pilot of the Colorado Springs have governed himself by the rule 11 of the pilot rules, which permits a departure from the other rules in special circumstances.

There seems to be no doubt that the collision occurred within five or six minutes after the signals were exchanged. In the exercise of reasonable prudence, the Colorado Springs should have slowed down at the time she blew for passing. Very shortly after that it became evident that the San Pasqual could not comply with her contract to pass to the right in time to avoid the collision. At that time the engines of the Colorado Springs should have been stopped and put full speed astern. If these precautions had been taken, there could be slight doubt that the collision would have been avoided. Under the circum-

stances, the Colorado Springs was equally guilty with the San Pasqual.

We agree with the District Court that the Barranca was not guilty of any fault. She was properly manned, and had sufficient power to handle the San Pasqual under ordinary circumstances. Her master was in his own pilot house, and could not see the Colorado Springs approaching because of the high free board of the San Pasqual, but it was not his duty to look out for her. He was not guilty of negligence in making fast to the ship's port quarter. It was immaterial whether he hooked up to the port quarter or the starboard quarter, as in either case vessels approaching from the other side could not have been seen by him. The navigation and handling of both vessels was in charge of the pilot of the San Pasqual, and the tug had the right to rely upon his competence. He gave all the orders to the tug by shouting them over the side to the tug captain, or relaying them to him through the master of the San Pasqual, and they were promptly obeyed by the tug. The San Pasqual was using her own rudder for steering, assisted by the tug, but all of the steering was done at the direction of the San Pasqual's pilot. The errors committed were solely his.

Appellant contends that, under the contract between the owners of the two vessels, the Barranca was employed to tow the San Pasqual from New Orleans to Santiago, Cuba, and she assumed full responsibility for the voyage. The District Court found against this contention on an analysis of all the evidence, which is fully set out in the opinion, and need not be here repeated. Based on the exchange of one or two communications, there might be some support for the contention of appellant, but, considering all of the correspondence and other evidence, it is quite clear that the owners of the tug declined to assume any responsibility for the navigation of the San Pasqual, and the contract was merely to furnish the necessary motive power, leaving the direction of the fleet to the officers in charge of the San Pasqual. We agree with the holding of the District Court in this respect also.

The judgment in No. 5419 is affirmed. The judgment in No. 5418 in favor of the Barranca is affirmed, but in other respects it is reversed and the case remanded, with instructions to divide the damages equally between the San Pasqual and the Colorado Springs, and for any other proper proceedings not inconsistent with this opinion.