**DALZELL v. UNITED STATES,·and three other cases.**

Nos. 12333, 12447, 12442, 12426.

District Court, E. D. New York.

April 20, 1932.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark, of New York City, of counsel), for libelant Dalzell.

Lucien V. Axtell, for libelants Keene and Larsen.

Duncan & Mount, of New York City (A. C. Muller, Jr., of New York City, of counsel), for libelant Briscoe.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Chas. E. Wythe, of New York City, of counsel), for the United States.

INCH,· District Judge.

These four suits have been duly tried together, as the causes of action arose from the same accident and the material facts, so far as the liability, if any, of the parties is sought to be shown, are the same in each case.

Libelant Dalzell is the managing owner of the tug Britannia, who sues on his own behalf and on ·behalf of his co-owners who are set forth in the testimony. This tug, while on her way from the Battery to Pier 95, North River, was collided with by respondent's steamer Coahoma County, and sunk.

Libelants Keene and Larsen represent members of the crew of the tug who were injured in the collision. Libelant Briscoe represents the administratrix of the goods, etc., of a member that was drowned.

It will be sufficient to state the facts found in the Dalzell suit. The same facts are found in each of the other suits.

Navigation Rules, art. 18, rule VIII (title 33 USCA § 203): "Rule VIII. When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals."

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the

way, the other shall keep her course and speed." (Title 33, USCA § 206.)

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse." (Title 33, USCA § 208.)

"Art. 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel." (Title 33, USCA § 209.)

These well-known and useful provisions, based on experience, have been set forth at the outset, for disobedience thereof brought about this accident.

Considerable testimony has been taken. A portion is represented by depositions of members of the crew of respondent's steamship.

Although all of this testimony has been carefully considered, together with the exhibits accompanying the depositions, as well as those introduced at the trial, the record does not show that these depositions of respondents were actually marked in evidence. As the record does show that they were duly offered and received, this omission becomes of no importance, and the parties can agree on such exhibit number as they prefer in case necessity arises.

The collision occurred in the afternoon of Friday, March 13, 1931. The weather was clear, the tide in the Hudson River was flood, visibility was good, or, as Captain Ing, of respondent's steamer Coahoma County says, there was "good seeing." What wind there was was from the northwest and light. In fact there was nothing about the weather or other conditions to justify or lead one to expect that this steamer would overtake and sink the tug Britannia; yet this is exactly what happened in the broad stream of the Hudson River. It happened solely because the rules first above mentioned were grossly violated by those in charge of the steamer.

The tug Britannia is a tug 100 feet long, 26 feet beam, 12 feet depth, 178 gross tons, 600 horse power. On the afternoon in question she had passed the Battery, on her way to Pier 95, proceeding at half speed, which, according to her captain, would make her "going about 6 knots over the ground." The tide was with her. Keene, her captain, was at the wheel. He is one of the old experienced captains in the harbor. For a quarter of a century he has been doing what is termed steamship work, assisting steamers in and out of docks, going aboard them, taking charge, etc. He had an experience of many more years. He was duly licensed. In the pilot house with him was his mate. The rest of the crew, consisting of engineer, firemen, oiler, and deck hands, were at their posts or distributed around the vessel.

Captain Keene was steering a straight course up the river, near the middle of the stream. There was nothing that had occurred that required him to change his course. There was the usual traffic and whistles in the river, but there is no evidence that anything unusual had occurred or was expected. The mate, who was on the left of Captain Keene, was keeping a lookout ahead. The windows of the pilot house on the port side were closed. The windows on the starboard side of the house were open. These were the usual windows that are dropped when open.

The Britannia had reached a point about off Canal street when the respondent's steamer Coahoma County, which was overtaking her, rammed the bluff of her bow up and over the port quarter of the Britannia, causing the tug to first list to the starboard and then swerve around the bow of the steamer and sink.

The oiler Briscoe was drowned. Larsen, the deck hand, broke his leg. The mate Moran escaped from the pilot house by breaking the starboard windows, which had been shoved up and closed by the shock of the collision. Just before the tug sank, stern first, Captain Keene escaped through these windows as her bow came up. He received injuries from his submersion. The remainder of the crew do not seem to have been injured.

Naturally this unusual and unnecessary accident requires a careful examination of the conduct of those in charge of the steamer Coahoma County.

The Coahoma County is a good-sized steamer 390 feet long, 54 feet beam, 27 feet depth, 5,590 gross tons. She had the usual crew consisting of captain, chief officer, second and third officer, boatswain, chief engineer, first assistant engineer, etc. She is a turbine, single screw, capable of making greater speed at sea, but whose full harbor speed is placed at 10 knots.

The evidence sufficiently shows that she was proceeding at this harbor speed except when the collision was imminent, when she was slowed down, her engines stopped and then ordered full astern. This belated order to stop and go astern was given by her cap-

tain who had taken the navigation out of the hands of the pilot, who was on the bridge with him, when the former saw what was going to happen.

The Coahoma County had seen the Britannia ahead, about a mile away, when the steamer was about off Cortland street. According to the captain, the Britannia then appeared to be about 150 feet to the starboard of the course being followed by the steamer.

When the steamer reached a point about 1,000 feet behind the Britannia, the pilot, who had boarded her at Sandy Hook, ordered a two-blast signal to be blown. He received no reply from the Britannia. There is nothing to indicate that the Britannia ever heard it. This situation was apparent to the pilot as well as to the captain of the steamer, yet they kept on. The pilot says that he then ordered the course of the steamer slightly to port, about half a point.

An effort is made by the witness for the respondent to excuse their carelessness by saying that the Britannia was proceeding in an erratic manner, first to the starboard and then to the port, but, after considering all the testimony, I find that this is not a fact, and that both vessels kept their courses until the accident happened.

When the steamer got about 200 feet behind the Britannia, Binert, the pilot, says he blew another two-blast signal, but again received no reply.

There is some dispute about these signals; some witnesses saying that they heard but one two-blast signal, others two, as indicated, and one witness (Perry) does not remember any whistles blown. They all agree, however, that there was no answer to any of them from the tug, and that no one appeared upon her decks.

Captain Keene says: "The first I knew of the steamer I thought I heard some unusual noise. I turned my head and looked back. The bow of the ship was right up over our port quarter. I just had time to pull the bell and start to roll the wheel, a jingle bell, it was a matter of seconds when our tug was rolled right over."

There also seems to have been confusion in the minds of some of the crew of the steamer as to what the Britannia was doing in the river. The chief officer, who was in the forecastle with his men, seems to have thought that the Britannia was there to help place the steamer in her berth. He was shouting when the tug was almost under the bow of the steamer, "if she was going to give us a line," although this was to no one on the tug that could be seen. It may well be that this was the noise that Captain Keene first heard.

On the other hand, Captain Ing, who was on the bridge, testifies he knew that the Britannia was not one of the tugs that were to assist the steamer, because he saw his two tugs "laying out in the river on the right side not far from us."

Binert, the pilot, throws a different light on this situation when he says: "I thought there was plenty of room, I only blew the two whistles (apparently the first two) as a sort of warning, realizing that I should have had an answer, I took a chance, I was relying on the tug to take care of herself."

Captain Ing admits "it was an overtaking situation. We were bound to keep out of the tug's way, at the same time she was supposed to answer my whistle signals, which she did not do. I admit that we struck the vessel but that was no fault of ours. If we had stopped our engines some time before we probably would not have bumped it."

Thus we have a comparatively large steamer overtaking a tug, indicating to the tug that she intended to pass her, and traveling much faster than the tug without having received any answer from the tug. There was no indication from the tug of any kind, that the steamer's presence was known to the tug. Nevertheless, on the assumption that the tug would "take care of herself," the bow of the steamer was run into the fantail of the tug and sank her.

There seems to me no reason to doubt the liability of such a steamer in deliberately ignoring the safety rules already mentioned, which, if they had been observed, would have obviated this accident.

There are indicated, as certainly one would expect in such an otherwise gross exhibition of carelessness, various excuses offered by the respondent for the conduct of those navigating the Coahoma County. One of these is that the tug deliberately took a course across the bow of the steamer. Careful consideration of the testimony of such witnesses shows that little or no reliance can be placed upon their testimony. Not only is the great preponderance of credible testimony opposed to this view, but their opportunity for observation as well as the lack of it, together with the very evident inaccuracy of testimony, makes one wonder why such witnesses did not also urge, as an additional excuse, the significant day and date.

The other reason is not urged particularly, nor could it well be, but it appears that some of those on board the Coahoma County had the idea that the tug ahead was one of the tugs waiting for the steamer in order to assist her to her berth. There was no reason to think this. The captain of the steamer knew better, and he was on the bridge; yet this may account for this unusual approach from behind which unfortunately resulted in the steamer running down the tug. Assuming that this confusion existed, the innocent tug ahead cannot be charged with such mistake on the part of the steamer, nor does it justify in any way the careless navigation of those in charge.

Operators of vehicles and vessels often seem to think that all that is necessary is to blow a horn or whistle and that this sufficiently complies with the rules and relieves them from further liability in proceeding. It is not the mere making of a noise without more that is intended by the rules and law, but, in the case of vessels, a proposal in a reasonable time of a course to be accepted or rejected by the other and, if not accepted, or on the contrary affirmatively rejected, to 'so control further progress by slowing down or even stopping until the dispute is properly settled, or taking another plainly safe course which is then available.

The mere failure to blow any proposed passing whistle by an overtaking vessel, on which ground respondent here seeks to distinguish certain cases where liability was found, may indeed be and usually is considered some evidence of negligent navigation. This for the reason that such failure or disobedience indicates carelessness in not even attempting to arrive at some safe prior agreement as to course.

It may be, however, according to the circumstances, that such failure to blow a whistle or failure to have a lookout is found not to be the proximate cause of the accident.

The purpose behind all such rules and regulations is to provide intelligent navigation and the exercise of reasonable care. It is not in the mere pulling of whistle cords.

Respondent urges, particularly, certain decisions as being in its favor. Long Island R. Co. v. Killien (C. C. A.) 67 F. 365; The Pleiades (C. C. A.) 9 F.(2d) 804; The Artemis (C. C. A.) 39 F.(2d) 553. I have examined these cases carefully but the facts in each are materially different from the facts before me, also as to the proximate cause found. For these reasons I do not consider that they are in point. In this case the sole proximate cause was the carelessness of those in charge of the steamer, the overtaking vessel.

The only remaining question is whether or not Captain Keene of the tug was careless in not being more attentive to whistles in the river or the near presence of the steamer.

I believe Keene's testimony when he says, on cross-examination, that he occasionally "looked behind," although he is not sure just when, that there was plenty of room in the river, and that he was pursuing, in broad daylight, a straight course.

Certainly a captain of a tug is not to presume that an overtaking steamer, with plenty of room to pass on either side, would deliberately run him down.

While the law is that, "although the statute does not specifically require the keeping of a lookout, no duty is more universally recognized or stringently enforced," The Scandinavia (D. C.) 11 F.(2d) 542; The William A. Jamison (C. C. A.) 241 F. 950; The J. W. Wonson (C. C. A.) 239 F. 857; The Lafayette (C. C. A.) 269 F. 917; The Stifinder (C. C. A.) 275 F. 271; article 29, 33 USCA § 221; yet it was neither a usual nor, in this case, a necessary requirement, imposed on the tug, to have a lookout at her stern as well as at her bow, The Merrill C. Hart (C. C. A.) 188 F. 49; The M. J. Rudolph (C. C. A.) 292 F. 740. The Holly Park (C. C. A.) 39 F.(2d) 572.

Occasionally there appears to be a conflict between this reliance solely on the rules and the court's requirement, under all circumstances, of the exercise of reasonable care. See The Industry (C. C. A.) 29 F.(2d) 29, 30; The Anna W. (C. C. A.) 201 F. 58.

The point therefore that I considered carefully is not as to a "lookout" at the stern, but whether the captain of the tug Britannia was careless in not more frequently looking around, either he or his mate, and in not sooner observing a plainly on-coming steamer. In doing this, due weight must be given to the circumstances of this case.

His duty consisted in keeping his speed and course had he agreed to the signals of the steamer. This he did.

There is therefore nothing in the complaint that he failed to accept the whistle signals of the steamer. He did all that was required of him had he in fact become aware of and accepted the signals of this overtaking steamer. As to his general duty to observe behind perhaps more attentively, I be-

lieve he acted with reasonable care, and the most the respondent can urge is a "doubt." Such doubt, in view of the gross negligence of the steamer, should be resolved in favor of the tug. The Reliance (C. C. A.) 25 F.(2d) 625; The City of New York, 147 U. S. 72–85, 13 S. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186–197, 15 S. Ct. 804, 39 L. Ed. 943.

The circumstances here gave the steamer plenty of room. There was no obstructing traffic. No reason is apparent for her running into the tug. The libelants were without fault.

Libelants are entitled to a decree.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), findings of fact and conclusions of law in accordance herewith may be submitted.