## THE SALUTATION.

### THE DELIVERY NO. 5.

#### No. 10.

Circuit Court of Appeals, Second Circuit.
Nov. 12, 1935.

610

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan and Leo F. Hanan, both of New York City, of counsel), for appellant.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

The appeal is from a final decree dismissing the libel in a suit to recover because of a collision in the East River, off the end of Pier 9, Brooklyn, at ten-thirty o'clock on the night of November 1, 1933, between the libellant's steam tug, "Salutation," and the claimant's tanker, "Delivery No. 5." The circumstances were as follows: The night was clear and windless and the tide ebb; the tug had had five barges in tow and had hung them at the end of Pier 9, Brooklyn, in the East River, where the river is about eighteen hundred feet wide. She laid them in two tiers, three abreast and two abreast; they extended into the river about one hundred feet. Being headed upstream, the master let the tug drift back on the tide, then started forward, and, after clearing the barges, hooked up under a starboard helm, meaning to cross the river and round the Battery, as he was bound for Jersey City. Before leaving he looked behind and seeing nothing in his intended path, kept on in a curving course, not looking back again and having no lookout. When about four hundred feet out from the pierhead he heard a double blast behind and to port, and looking back (he had to cross the pilot house to do so), he saw the tanker bound upstream about five hundred feet offshore. She was then so close aboard that it was too late for him to stop and back, so that, thinking his only safety lay in speed, he blew one blast, put on full power and nearly crossed the tanker's bows. Not quite, however, for she struck his port quarter about twenty-five or thirty feet from the stern, with so severe a blow that the tug sank after being towed back to a slip.

The tanker had come loaded through Buttermilk Channel bound for Long Island City. There was a dredge some six hundred feet off Pier 15, which she gave a berth of about one hundred feet, and thereafter began to edge in to the Brooklyn side. When abreast of Pier 10 or 11, she made out the tug's staff and port lights, the second barely visible. The tug appeared to her to be either going very slowly or stopped, and she gave her a two-blast signal. The tug at once crossed her signal with one blast which she answered with three, reversed her engine and put her helm hard aport, though it had little effect upon her heading. The judge found that the case was not a crossing situation but one of special circumstances, and held the tug at fault for a bad lookout downstream, for crossing the tanker's signal, and, as we understand it, for pressing on across her course. He exonerated the tanker because she had done all that she could in the circumstances. The libellant appeals.

We accept the facts as found, for, while we should have been disposed ourselves to place the collision slightly further offshore, that does not affect the result. The tug had in fact started away from her tow, and was on a definite course from the time she hooked up under a starboard helm. It does not of course follow that for purposes of navigation she was as yet on a "steady" course; that depended upon how far her future positions could be reasonably forecast by others who had to reckon with her presence. Commonwealth & Dominion Line v. United States, 20 F.(2d) 729, 731 (C. C. A. 2); The Boston Socony, 63 F.(2d) 246, 247 (C. C. A. 2). It may be admitted that it was not at once necessarily apparent whether she was bound upstream or would swing across the river; but long before the tanker in fact made her out it should have been known that she was not manoeuvring around her tow. In The John Rugge, 234 F. 861 (C. C. A. 2), it is true that the tug and tow

had started out after dropping two boats, and as matter of fact it may be debatable whether the other vessel ought not to have seen that she had, but in point of law the case decides nothing that we need question. It makes no difference here whether the tug appeared to be bound upstream or across; she was privileged in either case; her red light should have told the tanker to keep out of the way, for she was either crossing from starboard, or she was being overtaken; her consent was necessary either to cross her bows or to pass her. Moreover, as we have said, she should have been seen long before the tanker reached Pier 11, and made her out some five points on her starboard hand; she had already come four hundred feet out into the river without moving upstream at all. Even though her red light had not shown, it was inexcusable not to observe her staff light.

The tug appears to us also at fault. It is true that, if her master was justified in supposing that the tanker could make out his course, he was also justified in holding that course and his speed and even in crossing her signal. The Fulton, 54 F.(2d) 467 (C. C. A. 2). But, though privileged, he was not justified in keeping on beyond that point when the burdened vessel by her own efforts could no longer avoid collision. The Delaware, 161 U. S. 459, 468, 469, 16 S. Ct. 516, 40 L. Ed. 771; Wilson v. Pacific Mail S. S. Co., 276 U. S. 454, 48 S. Ct. 369, 72 L. Ed. 651. The judge has found that when the whistles were exchanged the tanker could do no more than she did; that, if true, is enough to condemn the tug, which had allowed matters to reach such an extremity. But, even if it be doubtful, she is still guilty, for she should have done more than give one look behind when leaving the flotilla; she was coming into crowded waters and might encounter upbound vessels not then visible. To excuse that fault she was bound to show that it could not have contributed to the disaster; which, translated into the terms of this particular occasion, means that earlier discovery of the tanker would not have enabled the tug to avert the collision. Certainly it is impossible to say that, if a sharp watch had been kept, it would not have been obvious in season that the tanker was coming too close aboard to extricate herself unaided. And the fault becomes worse, if the master supposed that his course might be mistaken for one upstream; he knew otherwise and should have been even more cautious. Indeed, regardless of the rules of navigation, it is fairly apparent that for two vessels to get so close on a clear night, without seeing each other, is alone strong antecedent reason for supposing that both must have been careless.

Decree modified to hold both vessels at fault; damages divided.