**SOCIETA ANONIMA NAVIGAZIONE ALTA ITALIA, owner and claimant of the Steamship THE MONGIOIA, Appellant,**

v.

**OIL TRANSPORT COMPANY, Inc., etc., Appellee.**

**SOCIETA ANONIMA NAVIGAZIONE ALTA ITALIA, Libelant, Appellant,**

v.

**OIL TRANSPORT COMPANY, Inc., etc., Appellee.**

**SOCIETA ANONIMA NAVIGAZIONE ALTA ITALIA, Claimant, Appellant,**

v.

**A & O TOWING COMPANY and THE Tug RAY, Appellee.**

**No. 15848.**

United States Court of Appeals
Fifth Circuit.
April 25, 1956.

Walter Carroll, Joseph M. Rault, Jr., Terriberry, Young, Rault & Carroll, New Orleans, La., of counsel, for appellant.

Brunswick G. Deutsch, Francis Emmett, Deutsch, Kerrigan & Stiles, Eberhard P. Deutsch, New Orleans, La., of counsel, for appellees.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

BROWN, Circuit Judge.

The Mongioia, an Italian ex-liberty ship, crashed in to the portside of the Tug Frank B. Durant's tow at 3:29 a. m. in the Mississippi River just below the Forebay entrance to the Industrial Canal. The District Court held her solely at fault. Her claim here, of course, is that she has been wronged by the District Court's action, so much so that she should go free and Durant cast for it all. Though nowhere reflected by written or spoken word, a faint whisper is detected that half a loaf would be better than none, and if not persuaded that she is guiltless, we should at least spread responsibility between the two with a decree for mutual fault.

Either undertaking is, of course, beset with some difficulties for the Mongioia. The first of which is the acceptance by us of fact findings unless clearly erroneous, C. J. Dick Towing Company v. The Leo, 5 Cir., 202 F.2d 850, 1951 AMC 1539; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99

L.Ed. 20, 1954 AMC 1999, in recognition of the fact finding function of the District Court. The second is the justifiable reluctance of an Appellate Court microscopically to scan a record in search of a complete or partial escape for a vessel whose fault is spectacular and glaring. The Queenston Heights, 5 Cir., 220 F.2d 120, 1955 AMC 797; The Great Republic, 23 Wall 20, 23 L.Ed. 55.

The Industrial Canal comes into the east side of the Mississippi River at a 20 to 30-degree down-river angle. The result is that a tow coming out of the Canal intending to proceed up-river must swing about 120 degrees to her right. As she heads out and comes into the stream, the river current (here 2 to 3 MPH) strikes the starboard side of the tow broadside tending to set her further downstream. The head of the tow, initially downstream, must be swung to starboard against the current through this 120-degree arc.

This was the maneuver of the tow made up of three loaded integrated steel oil barges (278 feet X 48 feet) and the twin-screw 1800 HP diesel Tug Durant pushing at the stern. The overall length of the tow was 952 feet. The Tug McCall, spotted in the river as a lookout for oncoming triffic, gave an all clear signal. The Durant, confirming that the river was clear, as it was, blew one blast and proceeded out from the Forebay in to the river. The Tug Ray was stationed with one line from her bow to a bitt about 50 feet aft of the port forward corner of the lead barge to push the head of the tow upstream and thus assist the Durant in swinging the tow.

The tow was properly lighted with red (port) amber (center), and green (starboard) screened barge lights on the forward end of the lead barge. There were no other lights, nor did the Rules require any, on the barges. So, from the bow of the lead barge aft to the Tug Durant, no lights outlined or marked the presence of these barges with their slight one and one-half foot freeboard. But the Durant had two searchlights, one playing on the starboard side of the tow and toward the starboard forward corner of the lead barge, the other aft on the east bank to reveal how far off the bank the stern was as the flotilla was swinging. And, in addition to her red and green running lights, the Durant displayed vertical white towing lights indicating that she was pushing a tow ahead or had one alongside. The Ray had running and towing lights, but as she pushed against the tow's port forward corner, nothing but her stern light (and miscellaneous deck lights) was visible to a vessel approaching from her stern. And it may be that, at her position and as the tow was swinging, she may have, from time to time, blanked out from view the red (port) light of the barge.

Mongioia was downstream bound for New Orleans, although at this time neither was aware of, nor navigating with respect to, the other. Durant soon became aware of Mongioia and when she was, by the tug's estimate, about 7 minutes and ¾ of a mile off from collision, the tug, considering that the upbound vessel was headed apparently on a course into the tow, blew the danger alarm of four blasts which was not, however, heard. The flotilla was then athwart the river, the swing having progressed to the stage where the tug's stern, angling down-river, was about 150 feet off the east bank, and the head of the tow, angling up-river, was about midway of the 2300 foot stream. About the same time and as a part of this precautionary action, the Durant's Pilot ordered and obtained extra, full power astern on the tug's engines to quicken the swing.

As Mongioia sketched the story, when about ½ to ¾ of a mile below collision, Mongioia saw two sets of lights of vessels not identified until after collision— those of the Tug Durant, 4 points off her starboard bow and near the east bank of the river—and those of the Ray, a stern light and miscellaneous deck lights indicating apparently a tug bound upstream, about two points off her starboard bow. She first blew two blasts to overtake on the Ray's portside.

No answer or reply was received, and Mongioia proceeded on under half-a-head making 6½ knots over the ground. When she was, her local Pilot judged, ¼ of a mile off, he had a change of heart, blew one blast to indicate he now desired to overtake the vessel (Ray) on her starboard side, put the engines on slow ahead and the rudder right to swing to starboard. The Pilot and the Italian Master were apparently unsure as to just what was ahead, for by use of the ship's powerful glasses, each scanned the area of the lights and at least one thought that there was a dark line on the water—which there was, of course, as it was Durant's barges. Within a few moments, Mongioia found herself 200 feet off the barges and her belated actions of dropping anchor and going astern were ineffectual. Her stem hit the portside of the middle barge about 100 feet aft of the bow end which meant that the tow was struck approximately 400 feet aft of the head of the tow.

Mongioia cannot divert the focus on her inexcusable conduct through any suggestion that it was fault for the tow to be where she was. Navigable waters are for little as well as for big vessels, for tows and nondescript floats, tugs or barges, as well as ocean liners. There was nothing about Mongioia or her mission which, from her position downstream, gave her the right to preempt the river ahead or demand that tows either await her pleasure, remake the tow, or undertake the swing into the river in such a way as to avoid impeding her voyage as she desired to make it. Complaint cannot be made of the tow's lights. Mongioia read them wrong, but this was not due to any act of the tow or the deficiency of the rules which affirmatively prescribe lighting requirements and forbid improvised lighting layouts which might confuse or mislead, 33 U.S.C.A. §§ 171, 181; Coast Guard Regulations, Rule 36, 33 CFR 80.36.

Nor, as she urges, does compressing this into the category of Special Circumstances, Old Time Molasses Co. v. United States (The Barranca), 5 Cir., 31 F.2d 963; Id., 20 F.2d 192, 1927 AMC 1208; The Invader (B. B. No. 21), 2 Cir., 54 F.2d 347, 1931 AMC 1854; The Arfeld (The Lacuna), D.C.E.D.La., 42 F.2d 745, 1930 AMC 1703; The Socony No. 19 (Helene No. 2), 2 Cir., 24 F.2d 653, 1928 AMC 602; The Dorset, 4 Cir., 260 F. 32, transfer all of the duties onto the tow or excuse Mongioia from the consequences of her flagrant errors. Actually, this offers a poor escape from the charge and holding that she violated the Crossing or Overtaking Rule. We would doubt that it was a case of crossing; see e. g., Inland Rule 19, 33 U.S.C.A. § 204; The Salutation (Delivery No. 5), 2 Cir., 79 F.2d 609, 1936 AMC 227; Clyde-Mallory Lines v. New York Central Railroad Co., 2 Cir., 83 F.2d 158, 160, 1935 AMC 1107; The Boston Socony, 2 Cir., 63 F.2d 246, 1933 AMC 330; Commonwealth & Dominion Line v. United States, 2 Cir., 20 F.2d 729, 1927 AMC 1690; for while the vessels lay at near perpendiculars, it was not the tow's purpose or intent to proceed on a course across the river to the west. Ordinarily, the giving-way vessel would pass under the stern of the privileged one but had Mongioia done this, it would have put her ultimately into the stern of the Durant, or at least into an unauthorized overtaking on Durant's starboard side, as the tow successfully swung into the thread of the stream. This indicates, we think, that while the tow was athwart the intended course of Mongioia and thus had to be avoided, she was not being navigated on an intersecting course.

As a specific situation, it came closer to being one of overtaking; see, e. g., Inland Rule 24, 33 U.S.C.A. § 209; Coast Guard Regulations 33 CFR 80.6; Socony Vacuum Oil Co. v. Smith, 5 Cir., 179 F.2d 672, 1950 AMC 445, 451; Northern Navigation Company v. Minnesota Atlantic Transit Co., 8 Cir., 49 F.2d 203, 1931 AMC 1001; The City of Baltimore, 4 Cir., 282 F. 490; The Socony No. 115, 58 F.2d 392; D.C.S.D.N.Y., 1932 AMC 441; Dalzell v. United States, D.C.E.D.N.Y., 60 F.2d 1068, 1932 AMC

816; The Monterey, D.C.S.D.N.Y., 171 F. 442; since at this stage of the swing, had Mongioia navigated prudently she could easily have passed between the angling head of the tow and the west bank of the river some thousand feet or so away. But the tow was not really proceeding in the same direction, nor was her position yet such that the port (red) running lights on the head of the tow or the pushing Tug Durant were obscured from view. 33 CFR 80.6(b); 33 U.S.C.A. § 209. What she was doing was all preparatory to getting underway on, or shaping up for, such a course.

But to be relieved of the onerous consequences of violating the statutory rules for Crossing or Overtaking is of less than momentary comfort to Mongioia. For each of these (and others) acts, gauged by the standard of prudent navigation, were equally faulty.

She was proceeding with inattentive lookout who, seeing, failed to report. Two hundred feet forward of the bridge, he engaged in the speculation roundly condemned for lookouts who assume that the bridge sees what they see. His inattention carried forward to collision moment for it was the bridge, not the lookout, which first saw the barge 200 feet off. The bridge could see 400 feet. A vigilant lookout should have done as well. Inland Rule 29, 33 U.S.C.A. § 221; The Sea Gull, 90 U.S. 165, 23 L.Ed. 90; The Genesee Chief, 12 How. 443, 53 U.S. 443, 13 L.Ed. 1508; The Ariadne, 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542.

Moreover, the lookout's unconcern merely mirrored the indifference of Mongioia's general navigation. The lookout saw but kept silent. The Pilot saw, but he closed his mind to what he saw or what it taught. He blew, but blowing called for an answer—an answer he never got though twice, but differently, requested.

Durant's lights were a plain notice that she had a tow either being pushed ahead or alongside. Because he couldn't or didn't, see the red (port) light of the lead barge, Mongioia's Pilot assumed that the tow must be alongside. But the Rules do not permit this speculation. And clearly at this place, it was an assumption that ignored the Pilot's awareness that heavy traffic could be expected in the area of the Industrial Canal. And this would, of course, include the modern, long and sometimes cumbersome and sluggish integrated oil tow.

But proceeding on these unwarranted assumptions was little different from forging ahead on unanswered signals. The only explanation the Pilot could give was that tugboats seldom replied— an excuse which made continuing on at least an incipient fault. But lack of answer was not all. The choice was first to pass on the port and then, without warning, answer, or assent, it was changed to the starboard with Mongioia all the while guessing that the upbound tug (Ray) had a tow ahead. And in taking these chances with respect to the supposed overtaken vessel (Ray), Mongioia was executing it in a manner which ignored the rights of the Durant, a tug known to have a tow ahead or alongside and which, to Mongioia, was thought to be on a crossing course. Granting for the moment that it should be viewed as Mongioia saw it, Mongioia deliberately cut across the bow of a crossing vessel, this time guessing that the tow was alongside or, if ahead, was unlighted and of unknown length.

This was navigation with impunity. It matters not that contrary to the baseless assumptions so frequently made by Mongioia, it was neither an overtaking as to Ray nor a crossing as to Durant, but a simple case of plowing into the side of a tow whose presence and position was lawful and ought to have been known.

In this setting, to succumb to Mongioia's prayers for divided damage would be for us to put a premium on navigational negligence of the flagrant, striking and obvious kind. This is so because Mongioia's plea is that her own navigational actions were so faulty, her errors so open and inexcusable, the resulting apprehension of imminent collision on the

part of those on Durant and Ray so marked, that Durant breached a duty to blow a second, or a third, or a fourth, danger signal to make Mongioia understand what her eyes and ears perceived not.

■ It is here that Mongioia's hard-pressed and successful contention that this was neither Overtaking nor Crossing perhaps puts her to some disadvantage for the failure to blow a second danger alarm, if wrong, does not become a statutory fault, as such, under 33 U.S.C.A. §§ 203, 204, 206, 207, 208, 209, 33 CFR 80.1, 80.3, 80.4, 80.6, 80.7, and thereby subject Durant to the dialectics of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148; see Griffin on Collision, Sections 201, 202, 203. To the contrary, Mongioia must have here established to the Trial Court's judicial satisfaction that the act was wrong, and therefore negligent, and that it had brought about the collision. Whatever might be the case as to the first inquiry—negligence—this record does not require a finding of proximate cause nor permit us to say that the District Judge's rejection of the claim was clearly erroneous.

Underlying this analysis, of course, is the repeated indifference of Mongioia generally to any navigational rules. It assumes a great deal, therefore, if, in saddling one-half of the cost of this inexcusable collision onto the Durant, we were to say that Mongioia *probably* would have heard the second (or third, etc.) alarm although the first went unheeded (or unheard), and that having heard it, would have acted reasonably on it. This reasoned skepticism finds further support in the fact, not successfully challenged, that the presence of the tow and its general maneuver was revealed additionally by Durant's searchlight fore and aft.

And at what time was Durant to have blown? And how often was she to have repeated it? The evidence does not show at what stage it was evident to Durant that Mongioia would not fulfill her duties and would collide unless stopped. To be sure, Durant didn't like the looks of the situation seven minutes and ¾ of a mile away from collision moment when she blew the alarm and put her engines full astern to hasten the swing—an action which she followed by sounding the general alarm to rouse all hands. This was but prudence to do all that physically she could do to reduce the likelihood of trouble or its serious consequences to life and limb if it did occur. There was, of course, ample water to the left of the tow's head and between it and the west bank. And while, to the Ray, it looked like Mongioia would shave her and the tow closely if she continued on in her apparent purpose to overtake on the portside, it was not until the right rudder and slow ahead, which Mongioia estimates was ¼ of a mile off, that it became almost certain that collision would occur. Mongioia offered neither proof that Durant at that time could plainly see that Mongioia was making things worse, not better, nor any that had the tug sounded a warning and it had been heard, Mongioia could effectually have avoided collision. The Pilot did make some isolated hopeful estimates that he could have stopped in 660 feet, but on his whole testimony the Judge may well have concluded that the Pilot needed much more, and perhaps as much as a quarter of a mile—something borne out perhaps by the time and distance actually run by Mongioia from the moment she finally sensed danger, put her engines astern, dropped her anchor until she finally came to a stop after the collision.

■ Of course, the purpose of the Rules is to prevent collision and duties rest on the innocent as well as the blameworthy. The facts and the total situation may impose, under statutory mandate or principles of general prudence, the obligation to blow danger alarms to alert an inattentive vessel to the danger which her neglect is about to create; see, e. g., Port Line v. United States, 2 Cir., 181 F.2d 365, 1949 AMC 1615; Tide Water Associated Oil Co. v. The Syosset, 3 Cir., 203 F.2d 264, 1953 AMC 730; Matton Oil Transfer Corp. v. The Greene, 2 Cir., 129 F.2d 618, 1942 AMC 1107; Henry DuBois Sons Co. v. A/S

Ivarans Rederi, 2 Cir., 116 F.2d 492, 1941 AMC 214; Merritt Chapman & Scott Corp. v. Texas Co., 2 Cir., 98 F.2d 719, 1938 AMC 555; Yamashita Kisen Kabushiki Kaisha v. McCormick Intercoastal S. S. Co. (The Yoshida Maru No. 1; The Charles R. McCormick), 9 Cir., 20 F.2d 25, 1927 AMC 1201; National Motorship Corp. v. United States, 2 Cir., 171 F.2d 413, 1949 AMC 165; James McWilliams Blue Line v. Card Towing Line, 2 Cir., 168 F.2d 720, 1946 AMC 1671; but for the fault to change the result and inflict legal consequences, it must have been a contributing cause, e. g., Cleary Bros. v. The Dauntless, 2 Cir., 178 F.2d 72, 1950 AMC 44; National Bulk Carriers v. U. S. (The Nashbulk; The Rutgers Victory), 2 Cir., 183 F.2d 405, 1950 AMC 1293; Crowley Launch & T. Co. v. Wilmington Transportation Co., 9 Cir., 117 F.2d 651, 1941 AMC 449; The Fort St. George (The Olympic), 2 Cir., 27 F.2d 788, 1927 AMC 1606; The Maine, D.C. Or., 2 F.2d 605, 1924 AMC 820; The Westhall, D.C.E.D.Va., 153 F. 1010.

The decision exonerating Durant and Ray was right. It is

Affirmed.