**CALIFORNIA TRANSPORT CORPORATION, Libelant,**

v.

**THE Tug ACCENTOR, her engines, etc., in rem, and Clifford C. Northon, Jr., in personam, Claimant-Respondent.**

**No. 4012.**

United States District Court
E. D. Louisiana,
New Orleans Division.

May 24, 1960.

Milling, Saal, Saunders, Benson & Woodward, Charles D. Marshall, Charles

W. Howard, Jr., New Orleans, La., for libelant.

Phelps, Dunbar, Marks, Claverie & Sims, John Poitevent, Charles Dunbar, III, New Orleans, La., for claimant-respondent.

J. SKELLY WRIGHT, District Judge.

The supertanker T.S. Gage Lund,[1] steaming up the Mississippi River in the harbor of New Orleans into a cluster of tug and barge traffic leaving and entering the Industrial Canal,[2] was in collision with the lead barge of one of the tows. In these proceedings the owner of the Gage Lund sues for her damages.

On August 29, 1958, the Gage Lund had been at anchor in quarantine anchorage, a little less than one mile below, and opposite from, the entrance into the Mississippi River from the Industrial Canal. After weighing anchor at 2119, she proceeded upriver at half speed, favoring the west bank 600 to 800 feet off, under the conn of her master and a Mississippi River pilot. Her course recorder shows that, after small variations while steadying up from quarantine anchorage, the Gage Lund maintained a heading of approximately 300 degrees true.

When the Gage Lund reached a position just below the Industrial Canal, the tug Accentor[3] was observed pushing her 350-foot tow[4] out into the river from the forebay of the Canal. The Canal

1. The T.S. Gage Lund is powered by a turbine drive steam engine rated at 12,500 horsepower and propelled by a single screw. She is 624 feet 9¾ inches in length overall, 84 feet 4 inches in breadth, and at the time of collision was loaded to a mean draft of 34 feet 3½ inches. Her permanent certificate of registry was issued by the Republic of Liberia and called for a crew of 47 persons excluding her master.

2. The Industrial Canal is the main artery of the Gulf Intercoastal Waterway flowing into the Mississippi at New Orleans.

3. The tug Accentor is pilothouse controlled, powered by a diesel engine rated at 400 horsepower, and propelled by a single screw. She is 97 feet 6 inches in length overall, 22 feet 6 inches in breadth, and was at the time of collision drawing 8 feet.

4. The Accentor at the time of collision was pushing ahead in tandem a tow of two barges proceeding on a voyage from Mobile, Alabama, to a barge landing on the Mississippi River near Carrollton Avenue, New Orleans, Louisiana. The lead barge in the Accentor's tow was the barge FBL–402 loaded with approximately 1,000 tons of oyster shells and drawing approximately 6 feet. The second barge in the Accentor's tow was the barge FBL–125 which was not loaded and was drawing only approximately 2 feet. The overall length of the Accentor and her tow was 451 feet 3 inches.

joins the river on its east bank at a downstream angle. Vessels bound up-river from the forebay emerge in a downstream direction and then swing around through an arc of approximately 135 degrees. This maneuver brought the Accentor and her tow more than half way across the 2,000-foot river before she was headed up parallel to the bank. At this time the Gage Lund was less than a quarter of a mile astern of the Accentor, making good, at half speed, seven knots against the two-knot current, while the Accentor was making good three.

When the Gage Lund determined that the Accentor was bound upstream on leaving the forebay of the Canal, she sounded a two-blast overtaking signal,[5] to which signal the Accentor did not respond, apparently because it was not heard. Nevertheless, the Gage Lund came slightly to port about ten degrees and reduced her engines from half to slow speed for the overtaking maneuver. At this point, a downbound tow favoring the west bank was observed. The Gage Lund sounded a one-blast signal to this tow for a port to port passage and returned her engines to half speed. About the same time a third tow leaving the Industrial Canal bound upstream turned inside the Accentor favoring the east bank.

Parallel clearance between the Gage Lund and the downbound tow was approximately 200 feet, but the clearance to starboard between the Gage Lund and the tow of the Accentor was only 60 feet. So close were the two vessels that the pilot, standing on the starboard wing of the bridge of the Gage Lund, and the master of the Accentor in her pilothouse were able to exchange insults with respect to the navigation of the other's vessel. As the Gage Lund began to draw ahead of the Accentor past her tow, the lead barge thereof gradually fell down on the starboard quarter of the Gage Lund, striking her in the way of the No. 10 wing tank.

The Gage Lund maintains that for some unaccountable reason the Accentor allowed the head of her lead barge to fall off to port sufficiently to bring it into contact with the starboard side of the Gage Lund. The Accentor charges that, because of the speed and proximity of the passage, her tow was sucked into the side of the Gage Lund in spite of the tug's emergency efforts in the form of hard right rudder to break the suction. The Accentor also charges that while in the act of overtaking her tow the Gage Lund came sharply to starboard, thus creating or increasing the suction. Her course recorder shows, and the Gage Lund admits, the sharp change of course to starboard, but asserts that the change was made in extremis in an effort to swing her stern to port clear of the tow of the Accentor.

Sole fault for this collision must be attributed to the Gage Lund. Her initial fault was charging into a crowded area of the Mississippi River in the harbor of New Orleans at the entrance to the Industrial Canal where cumbersome tows could be expected to be, and were, encountered leaving and entering the Canal.[6] Then, instead of pro-

5. Navigation of the waters wherein this collision occurred is governed by the Inland Rules of the Road, Articles 1–32, 33 U.S.C.A. §§ 151–232, and Coast Guard Regulations, 33 C.F.R. §§ 80.01–80.36.

6. See Culbertson v. The Steamer Southern Belle, 18 How. 584, 59 U.S. 584, 15 L.Ed. 493; Societa Anonima Navigazione Alta Italia v. Oil Transport Co., 5 Cir., 232 F.2d 422, 1956 A.M.C. 1073; Old Time Molasses Co. v. United States, 5 Cir., 31 F.2d 963, 1929 A.M.C. 687.

In Old Time Molasses Co. v. United States, the court stated at page 965:

" * * * A vessel entering a crowded harbor, such as New Orleans, is bound to exercise more than ordinary care. Culbertson v. Steamer Southern Belle, 18 How. 584, 15 L.Ed. 493. The purpose of requiring vessels navigating the Mississippi River from New Orleans to the Gulf to employ licensed pilots is to have them in charge of experienced men familiar with local conditions, in order to avoid, so far as possible, accidents to

ceeding ahead slowly in the face of this unwieldy traffic moving in all directions in the river, this super tanker continued to make good seven knots in the face of a two-knot current.[7] Because of the traffic, she was forced into close quarters with the tow of the Accentor, causing the head of that tow to be pulled by suction down on her starboard quarter.[8]

 It may be unfortunate that large oceangoing super tankers like the Gage Lund are required to share the nation's waterways with lowly tugs pushing tows. But tugs and tows have as much right in the Mississippi River as proud ocean liners,[9] and these ocean liners are charged with the knowledge that tugs and tows are unwieldy and difficult to navigate and that due allowance must be made for these debilities.[10] Here the Gage Lund, contemptuous of the low-lying craft, provoked simultaneously an overtaking situation with one tow and a passing situation with another. Under the circumstances, she assumed the risk of collision.[11] As the overtaking vessel she was bound to stay clear of the Accentor.[12] This she failed to do, and for this she must be held solely at fault.

Decree accordingly.

themselves and other vessels. The pilot of the Colorado Springs knew, or should have known, from his experience that in entering the harbor he was apt to encounter vessels leaving the anchorage grounds or docks. * * *"

7. See Inland Rules, Art. 29 (33 U.S.C.A. § 221).

8. See The Potomac, 70 App.D.C. 215, 105 F.2d 94, 1939 A.M.C. 1296; The Clevelander, 2 Cir., 83 F.2d 947, 1936 A.M.C. 811; The Cedarhurst, 2 Cir., 42 F.2d 139, 1930 A.M.C. 1148.

9. In Societa Anonima, etc. v. Oil Transport Co., supra, the court stated at page 425 of 232 F.2d:
"Mongioia cannot divert the focus on her inexcusable conduct through any suggestion that it was fault for the tow to be where she was. Navigable waters are for little as well as for big vessels, for tows and nondescript floats, tugs or

barges, as well as ocean liners. There was nothing about Mongioia or her mission which, from her position downstream, gave her the right to pre-empt the river ahead or demand that tows either await her pleasure, remake the tow, or undertake the swing into the river in such a way as to avoid impeding her voyage as she desired to make it. * * *"

10. The Syracuse, 9 Wall. 672, 76 U.S. 672, 19 L.Ed. 783; Griffin on Collision, §§ 30, 229(4).

11. Charles Warner Co. v. Independent Pier Co., 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195; Harris v. Sabine Transp. Co., 5 Cir., 202 F.2d 537; Socony-Vacuum Oil Co. v. Smith, 5 Cir., 179 F.2d 672.

12. Inland Rules, Art. 24 (33 U.S.C.A. § 209); Coast Guard Regulations, 33 C.F.R. § 80.6; Diamond v. The Motor Vessel Fernside, 5 Cir., 252 F.2d 381.