**BUCOLO, INC., Plaintiff,**

v.

**S/V JAGUAR, her engines, tackle, etc. and Boat Jaguar, Inc., Defendants.**

**Civ. A. No. 68–940–G.**

United States District Court
D. Massachusetts.

Nov. 7, 1969.

Richard B. Kydd, Kneeland, Splane & Kydd, Boston, Mass., for plaintiff.

Edwin R. Trafton, Boston, Mass., for defendants.

## OPINION

GARRITY, District Judge.

This is a collision at sea case in which the parties are owners of fishing vessels seeking damages from each other arising from a collision of the vessels in the Fort Phoenix Reach at the entrance of the harbor at New Bedford at approximately 12:15 A.M. on June 30, 1968. The collision occurred about 150 yards south of the hurricane dike which lies at the entrance of the harbor. Plaintiff's vessel, the Elizabeth Ann, was about to enter the harbor and was traveling in generally a northerly direction and defendant's vessel, the Jaguar, was outbound, traveling generally in a southerly direction. The channel in which the collision occurred is narrow, approximately 350 feet wide and known as the Fort Phoenix Reach. There are rocks beyond the boundaries of the channel in the area where the collision occurred.

The night was clear and calm and visibility excellent. A quarter moon shone clearly. Traffic in the channel was very light, only one other vessel proceeding through it. As the parties' vessels approached each other, both vessels had their running lights operating and the radar on the Elizabeth Ann was operating but not being employed inasmuch as the master was steering by visual observation. The Elizabeth Ann was 70 ft. long, 17 ft. wide and 8 ft. in depth and was empty, having unloaded its catch the previous afternoon at Hyannis. It was proceeding at a speed of approximatly 10 knots.

The Jaguar was 63 ft. long, 14 ft. wide and 9½ ft. in depth and was carrying only ice. It had three control stations, one in the foremast 40 ft. above the deck, one in an aft cockpit and one in a pilot house forward of the foremast. The master of the Jaguar, a physician who operates the vessel with a crew of five during the summer months, was in the forward pilot house at the time of the collision and no speed controls nor signaling devices were located there. There were speed controls in the control stations in

the foremast and in the aft cockpit, where a signaling device was also located. The pilot house covered the forward hatch and was approximately 8 ft. high, 3 ft. wide and 5 ft. long. It had windows on all sides, which were about 2½ ft. high, starting about 5½ ft. above the deck and rising to the top of the pilot house. On the port side of the pilot house there was a vertical pipe 3 to 4 inches in diameter supporting an overhead radar. There were vertical structural members at each corner of the pilot house and doors on either side toward the rear. At the time of the accident the master of the Jaguar was standing just inside the starboard door. No other member of the crew was on deck. The Jaguar's radar was not operating. The Jaguar was traveling at about 8 to 10 knots (a knot is approximately 1⅛ miles per hour). The effect of the rates of speed of both vessels was that they were approaching each other at a rate of approximately 10 yards per second.

The Elizabeth Ann was on the starboard or easterly side of the channel and on a steady northerly course. The Jaguar came through the relatively narrow channel, about 150 ft. wide, which cuts through the hurricane dike and headed for No. 7 buoy marking the westerly side of the broader channel leaving the harbor. At this point it was necessary for the Jaguar to adjust its course slightly so as to travel in a straight line through the reach, which is practically straight as it leaves the harbor. The slight change in course is necessary because of the relative widths of the narrow channel passing through the dike and the broader reach. The master of the Elizabeth Ann saw the Jaguar as it proceeded southerly through the dike, observing its masthead light and red port light. He saw the Jaguar change course in the vicinity of No. 7 buoy, at which time the Elizabeth Ann was on the opposite side of the channel proceeding northerly, midway between No. 6 and No. 8 buoys. When the Elizabeth Ann's skipper, who was alone on deck, the engineer having gone below 5 to 10 minutes

earlier in order to awaken the other members of the crew, observed the Jaguar's change of course, the vessels were approximately 100 yards apart. From that moment until the collision, all three running lights of the Jaguar were observed by the Elizabeth Ann's skipper. Both vessels maintained a steady course until the collision, except that the Jaguar veered slightly to starboard immediately before the impact. The Jaguar crossed into the easterly side of the channel in violation of Article 25 of the Navigation Rules for Inland Waters ("Inland Rules"), 33 U.S.C. § 210, and its master did not observe the Elizabeth Ann until the vessels had closed to within 5 to 10 yards. The Elizabeth Ann's master gave a single blast of her whistle when the vessels were about 50 yards apart and disengaged the clutch moments before the impact. There was no response to the Elizabeth Ann's signal by the Jaguar, whose skipper did not hear it. The Elizabeth Ann gave no further signals.

The Jaguar rammed the port side of the Elizabeth Ann about midships and the Jaguar's pulpit for swordfishing which extends forward from its bow was driven over the deck of the Elizabeth Ann and raked along the deck towards the stern, doing considerable damage. The forward portion of the Jaguar was also severely damaged, including the entire port side of the forward pilot house in which the master of the Jaguar had been standing. The angle between the port sides of the vessels at the moment of impact was approximately 50 degrees, indicating that the Jaguar had come at the Elizabeth Ann from a side angle. The master of the Elizabeth Ann testified that, as he observed the three lights of the Jaguar approaching him, he understood its course and intention and believed that it was not approaching head on but rather on a crossing course, that is, a course which would take the Jaguar to the rear of the Elizabeth Ann. The evidence at the trial was confined to issues of liability inasmuch as the parties stipulated that each of the vessels suffered $9,000 damage.

The defendant concedes that it was at fault in causing the collision, but contends that the plaintiff was also at fault and that therefore the damages should be divided equally, i. e., in this case, where the damages were equal, that each should cancel out the other. The defendant contends that the plaintiff was guilty of a statutory fault before the collision in that it violated Article 18 of the Inland Rules, specifically Rules I and III found in 33 U.S.C. § 203, and that thereby the plaintiff became subject to the "Pennsylvania rule" derived from the case of The Pennsylvania, 1874, 86 U.S. 125, 22 L.Ed. 148, that the vessel thus cast in fault must prove, in order to escape liability, not only that the fault shown probably did not but also that it could not have contributed to causing the collision. Rule I requires that where vessels are meeting end on, or nearly so, in such a manner as to involve risk of collision they signal their intention to pass on the port side of each other by giving a short and distinct blast of the whistle. Rule III provides that, if a vessel approaching another fails to understand the course or intention of the other from any cause, the vessel so in doubt shall immediately signify the same by giving not less than four short and rapid blasts of its whistle.

██ Upon a consideration of all the evidence, the court finds that the plaintiff committed a statutory fault by failing to give a danger signal, in violation of Rule III. The Elizabeth Ann's master saw the Jaguar heading straight toward him from a point about 100 yards distant, at which the Jaguar had changed course. When the Elizabeth Ann signaled, presumably for a port-to-port passing, the Jaguar did not respond. Thereupon it became the duty of the Elizabeth Ann to blow danger signals to alert the inattentive Jaguar to the danger which the Jaguar's neglect was about to create. See Societa Anonima Navigazione Alta Italia v. Oil Transport Co., 5 Cir., 1956, 232 F.2d 422, 427. The Elizabeth Ann's master's testimony that he understood the Jaguar's course does not prevent Rule III from applying. The statutory fault occurs not only when there is an awareness of danger but also when there should be an awareness of danger. Arthur-Smith Corp. v. Gulf States Marine & Min. Co., 5 Cir., 1958, 258 F.2d 449.

The question thus becomes whether the Elizabeth Ann's fault could not have contributed to causing the collision. The court believes that this has not been shown. True, the master of the Jaguar was evidently in a reverie when he neither saw the oncoming lights of the Elizabeth Ann nor heard its passing signal. But reveries are transitory and the Jaguar's skipper's failure to hear the single blast is not persuasive that he would not have heard the several short and rapid blasts, not less than four, required by Rule III. There was no evidence that the Jaguar's master was in a stupor; he reacted quickly when he finally saw the Elizabeth Ann. The maneuverability of the relatively small vessels involved, the location of the master of the Jaguar near the bow of the vessel and the stillness of the sea and wind all indicate that the collision might well have been averted had plaintiff's skipper sounded the danger signal. The court is mindful, in support of plaintiff's position on this issue, of the fact that there were no engine controls in the Jaguar's forward pilot house and that it would have taken her master a few seconds to get back to the aft cockpit where the nearest engine controls were located. Nevertheless, the court concludes that the Elizabeth Ann's statutory fault could well have contributed to causing the collision and indeed probably did so.

Parenthetically, the court believes that the Elizabeth Ann committed another statutory fault in violation of Rule I in that it did not signal for a portside passing as soon as practicable. See New York, N. H. & H. RR. Co. v. Baltimore & O. R. Co., 2 Cir., 1956, 236 F.2d 228. Despite the angle of the collision the court considers that the vessels were approaching each other head and head in the sense of nearly end on. The channel is narrow; rocks lie beyond its boundaries in the area of the collision; the Elizabeth Ann

was close to the easterly edge of the channel—the Jaguar was plainly heading out to sea. However, the court finds that this fault of the plaintiff could not have contributed to the causing of the collision because, since the Jaguar's skipper did not hear the signal given when the vessels were approximately 50 yards apart, he could not reasonably be expected to have heard a single signal sounded when the vessels were 100 yards apart.

Plaintiff urges that the circumstances of the collision warrant application of the major-minor fault principle which relieves from liability for half the total damage a vessel whose contributory fault is minor or doubtful, when the major fault of the other is sufficient to account for the disaster. The City of New York, 1893, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84. Clearly the Jaguar's negligence was the major cause of the collision in this case, especially the lack of watchfulness of the Jaguar's master, who did not see the Elizabeth Ann although it was properly lighted, who did not hear the whistle sounded by the Elizabeth Ann and who was steering the Jaguar from a station at which he had no control over the engine and no signaling device at hand. Also the entire crew of the Jaguar was below deck so that there was no one at a control station with whom the master could communicate if he required that the engines be reversed or that a signal be sounded. On the other hand the fault of the Elizabeth Ann was not at all technical nor did it occur when the vessels were *in extremis*. The Elizabeth Ann's master had the Jaguar under continuous observation from the time it passed through the hurricane dike at the harbor entrance. The plain purpose of Rule III is to prevent collisions precisely like the one here involved, by alerting the other vessel to a danger which it apparently does not perceive. The court concludes that the major-minor fault rule is inapplicable.

Judgment will be entered for both parties in identical amounts, $9000, for the plaintiff against the defendant on the complaint and for the defendant against the plaintiff on the counterclaim.